IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : CRIMINAL ACTION
: NO. 03-632
v. :
:
IAN NORRIS :

M E M O R A N D U M[1]

EDUARDO C. ROBRENO, J.  JULY 12, 2010

**I. BACKGROUND**

The Defendant Ian Norris ("Norris") contends that attorney Sutton Keany ("Keany") individually represented him while he served as a corporate officer of the Morgan Crucible Company plc ("Morgan"), a British corporation, during the period the United States Department of Justice Antitrust Division (the "Antitrust Division") was investigating Morgan for involvement in a price fixing conspiracy.

Norris argues Keany dually represented him individually and Morgan as a corporation. Morgan has waived the attorney-client privilege. Norris contends, however, that admission of Keany's testimony would violate the attorney-client privilege as it applies to him. Defendant also moves to suppress written non-contemporaneous summaries ("scripts") of what employees claimed had occurred at meetings attended with Morgan's competitors.

On July 6, 2010, the Court held an evidentiary hearing

---

[1] This memorandum represents the Court's findings of fact and conclusions of law.

to determine whether Keany individually represented Norris. On July 9, 2010, the Court heard argument on the matter. This issue is presently before the Court.

After consideration of the testimony presented at the evidentiary hearing, the Government's proposed findings of facts (doc. no. 103), Defendant's proposed findings of facts (doc. no. 101) and arguments of counsel, below are the facts the Court finds to be true.

**II. FINDINGS OF FACT**

A. The Grand Jury Investigation

1. On or about April 27, 1999, Morganite (a U.S. subsidiary of Morgan) was served with a subpoena by the federal grand jury sitting in the Eastern District of Pennsylvania investigating alleged price fixing ("April 1999 Subpoena"). See Indict. ¶ 12; Hrg. Tr. 11:8-15.

2. Morgan retained Winthrop Stimson, Putnam & Roberts (the "Law Firm") to handle Morganite's response to the April 1999 Subpoena and to conduct its own internal investigation. Hrg. Tr. 11:8-15, 102:25-103:1-6.

3. The Law Firm's "relationship partner" for Morgan was, former partner, Jerry Peppers ("Peppers"). Hrg. Tr. 14:14-18; 15:2-8.

4. Peppers assigned the matter to his partner at that time, Keany, who became the principal partner handling the grand jury matter for Morgan. Hrg. Tr. 11:8-18.

5. Between April 1999 and August 2001, Keany was the primary contact with attorneys from the Antitrust Division. See DX-3, DX-4, DX-24, GX-44, GX-101, GX-102, GX-103. Between April 1999 and approximately August 2000, the investigation involved mainly document gathering and production in the United States. See Hrg. Tr. 58:23-25.

B.  The Meeting Summaries ("Scripts")

6. On August 30, 2000, in the course of his internal investigation, Keany asked Morgan executives to "[p]rovide any documents (located in the U.S. and abroad) describing or referring to any meeting or other communication between (i) any of the relevant individuals and (ii) representatives of any competitor in the relevant business area, particularly Carbone." DX-4 (Email from S. Keany to B. Dunlap, D. Coker, and J. Peppers re: Draft Document Request, dated August 30, 2000).

7.  As part of his investigation of the grand jury matter, Keany later interviewed Morgan executives in Windsor, England.  During his first interview, Keany learned that Norris' subordinates had drafted non-contemporaneous meeting summaries ("scripts") of the competitor meetings.  Hrg. Tr. 35:13-25-36:1-11.  The first Morgan executive to be interviewed had the notes with him at the interview and appeared to be consulting the notes during the interview.  Hrg. Tr. 35:18-24.  When Keany asked about the notes, the Morgan executive showed Keany the notes and told him they were drafted after an internal meeting (chaired by a Morgan executive, Mr. McFarland) convened to discuss Morgan's

alleged price fixing meetings with their business competitors, which were of interest to the Antitrust Division. Hrg. Tr. 35:21-25-36:1-11.

8. After the first interview, Keany spoke with Norris, during lunch in the Morgan cafeteria, and mentioned the existence of the scripts to Norris and David Coker ("Coker"), Morgan's "chief administrator." Hrg. Tr. 80:19-21; 17:16-19; 81:10-12.

9. Keany told Norris and Coker that Morgan was not under a legal duty to produce the scripts to the grand jury in response to the subpoena because they were not located in the United States. Hrg. Tr. at 39:14-23. But Keany expressed his opinion that the content of the scripts would be helpful and that he wanted to provide them to the Antitrust Division. Hrg. Tr. 81:21-22. Keany believed the scripts supported Morgan's position in the investigation that Morgan had met with competitors only for lawful reasons, i.e., to discuss legitimate joint ventures that existed between the companies. Hrg. Tr. 39:14-18; 63:4-16; 64:1-14; 68:11-18.

10. Norris and Coker agreed to let Keany produce the scripts to the Antitrust Division. Hrg. Tr. 40:3-16; 81:6-25-82:1-17.

11. Keany then reached an agreement with the Antitrust Division that by providing certain documents, including the scripts (the "selected documents"), Morgan would not waive its right not to produce other foreign-based documents. GX-44; Hrg. Tr. 40:23-25-41:1-16.

12. On November 29, 2000, Keany sent an email to Norris telling him that the Antitrust Division was prepared to permit Morgan "to produce a copy of the [selected documents] related to the [joint venture] meetings" without waiving its right not to produce other documents. Keany wrote to Norris that he proposed producing the selected documents subject to any comments Norris or others who were copied on the email might wish to make. GX-44; Hrg. Tr. 41:8-25-42-1:10. Norris did not object to Keany's proposal to send the scripts to the Antitrust Division. Hrg. Tr. 42:1-10.

13. On December 21, 2000, Keany sent an email to Norris, Peppers, Coker and others, informing Morgan recipients that he would be producing the selected documents to the Antitrust Division, but did not specifically identify the scripts as being part of the documents produced. DX-11 (S. Keany email to I. Norris cc: F. Wollman, D. Coker, J. Peppers, B. Dunlap et. al., dated Dec. 21, 2000).

14. Keany mailed the selected documents, including the scripts, to the Antitrust Division on December 21, 2000. DX-12

15. Sometime later (not specifically identified), Coker called Peppers to complain that he felt Keany produced the selected documents without authorization. Hrg. Tr. 109:2-22.

C. The Scope of Keany's Representation

16. Keany met at least twice with Norris in connection with the grand jury investigation. They also spoke on occasion in the Morgan cafeteria at lunch and by telephone. Hrg. Tr. 17:20-

24. Each time they met, Keany initiated the meeting. Hrg. Tr. 32:22-25-33:1-3.

17. On July 30, 2001, the Antitrust Division sought confirmation of the scope of Keany's client representation in the matter. GX-101 (Letter from L. McClain to S. Keany dated July 30, 2001); Hrg. Tr. 29:1-4.

18. That same day, Keany wrote an email to Messrs. Coker and Wollman, copying Messrs. Dunlap and Peppers, informing them of the Antitrust Division's request. Keany stated, "I told her that there was no mystery at all: this [Law Firm] represents the parent company, its affiliates and its current employees, including but not limited to, Mike and Bruce. She expressed no surprise (one wants to say 'of course') but asked me to confirm that information in writing." GX-102 (Email from S. Keany to F. Wollman, D. Coker. cc: J. Peppers, B. Dunlap).

19. On July 31, 2001, Keany responded by letter to the Antitrust Division:

> I am responding to your letter of July 30, 2001. . . . As you know, this [Law Firm] represents Morganite Industries, Inc. and its parent company, The Morgan Crucible Company plc, in connection with matters related to the investigation which you are conducting on behalf of the Division. We presumptively also represent all current employees of the companies in connection with the matter. Only Messrs. Cox and Muller were at one time identified as individuals that you would like to have appear before the grand jury; when that occurred, we acted on their behalf. We continue to do so. Should you wish to call other employees, I assume that we would also represent those individuals.

GX-101 (Letter from S. Keany to L. McClain dated July 30, 2001).

20. Keany's intent in sending the letter to the

Antitrust Division was to ensure that he would be made aware if the grand jury subpoenaed Morgan employees.  Hrg. Tr. 29:20-23; 30:12-13.

21. Keany was "at [Norris'] side" during an interview Norris has with Canadian Antitrust authorities as part of his corporate representation of Morgan.  Hrg. Tr. 84:4-21.  Keany also appeared with Norris, at an earlier, unrelated, sworn interview of Norris by the Federal Trade Commission, as part of his corporate representation of Morgan.  Hrg. Tr. 53:3-13.

22. At some earlier date, the Law Firm also provided Norris with a letter identifying the Law Firm as Norris' counsel in case he encountered difficulties with immigration officials, while crossing the border into the United States.  Hrg. Tr. 106:10-14.

23. Peppers understood the Law Firm also represented Norris personally.  Hrg. Tr. 105:15-25.  In late September 2001, Norris asked Peppers "if [Keany] could continue to represent [Norris]."  Hrg. Tr. 119:7.  However, Peppers did not witness Norris ask Keany or any other attorney to personally represent Norris.  Hrg. Tr. 120:20-25.

24. Keany understood that he represented Morgan as a corporate entity, and not Norris as an individual.  Hrg. Tr. at 21:23-25-22:1-25; 23:1-3; 31:21-25; 33:4-9.  Keany told Norris that he represented the company (Morgan) and did not represent Norris personally.  He also advised Norris to hire independent counsel.  Hrg. Tr. 22:2-25; 23:1-3; 33:4-9;.

25. At no time did Norris ask Keany to represent him personally. Hrg. Tr. 21:23-25-22:1. Norris and Keany never discussed personal legal matters. Everything they discussed in connection with the investigation solely concerned Morgan/Morganite business and corporate matters. Hrg. Tr. 25:17-25-26:1-12.

26. Morgan (and its subsidiaries and affiliates, including Morganite) has waived its attorney-client privilege as to communications with Keany regarding his representation of Morgan in connection with the grand jury investigation. GX-100

After consideration of the Defendant's motion to suppress and the Government's motion to permit Keany's testimony, the parties' opposition thereto, and testimony given at the evidentiary hearing and oral argument on the motions, the issue is now ready for disposition.

### III. CONCLUSIONS OF LAW AND DISCUSSION

A. <u>Applicable Law</u>

The attorney-client privilege is designed to encourage uninhibited communication between clients and their attorneys. <u>Haines v. Liggett Group, Inc.</u>, 975 F.2d 81, 90 (3d Cir. 1992). Under both federal and Pennsylvania law, corporate officers and directors may not claim a privilege for communications made to counsel in their corporate capacities. <u>In the matter of Bevill, Bresler and Schulman Asset Management Corporation</u>, 805 F.2d 120, 124-25 (3d Cir. 1986); <u>Maleski by Chronister v. Corporate Life Ins. Co.</u>, 641 A.2d 1, 4 (Pa. Commw. Ct. 1994).

To assert a claim of attorney-client privilege as to communications with corporate counsel, corporate officers must demonstrate that:

> First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

Bevill, 805 F.2d at 123 (citing In re Grand Jury Investigation, 575 F.Supp. 777, 780 (N.D. Ga. 1983); Maleski, 641 A.2d at 4-5 (adopting the five-part Bevill test for the purpose of Pennsylvania law). "[T]he party asserting the privilege bears the burden of proving the existence of each element of the privilege." United States v. Fisher, 692. F.Supp. 488, 490-91 (E.D. Pa. 1988).

On this issue, Bevill is controlling. In Bevill, the Third Circuit affirmed Judge Debevoise's holding that corporate officers could not assert individual attorney-client privilege to prevent the disclosure of corporate communications with corporate counsel after the corporation's privilege was waived. In making his determination, Judge Debevoise relied on the test formulated by a Georgia district court. See In re Grand Jury Investigation, 575 F. Supp. 777, 780 (N.D. Ga. 1983) (relying in turn on In re Grand Jury Proceedings, Detroit, Mich., Aug. 1977, 434 F.Supp.

648 (D.C. Mich. 1977) (finding that a corporation has waived its privilege and since a corporation can act only through its officers, corporate officer could not assert the attorney-client privilege as to matters involving the affairs of the corporation); In re Grand Jury Subpoena Duces Tecum, 391 F.Supp. 1029 (D.C.N.Y. 1975) (finding that individual claiming privilege must: (1) inform the counsel that he (the individual) is consulting and communicating with the counsel as an individual rather than as a representative of the corporation; and (2) the attorney must see fit to accept and give communication, knowing the possible conflicts that could arise)).

Subsequently, numerous district courts within the Third Circuit have approvingly applied the Bevill test in situations similar to this case. See e.g., Applied Technology Intern., Ltd. v. Goldstein, No. 03-848, 2005 WL 318755, *3 (E.D. Pa. Feb. 7, 2005) (applying Bevill and finding that corporate officer did not seek legal advice as an individual and officer made no showing the communications related to personal matters); U.S. ex rel. Magid v. Wilderman, No. 96-4346, 2006 WL 2346426, *4 (E.D. Pa. Aug. 10, 2006) (finding that corporate officer presented no evidence to satisfy the Bevill test and could not sustain personal privilege claim); First Fidelity Bancorporation v. National Union Fire Ins. Co. of Pittsburgh, PA., 1992 WL 6781, *1 (E.D. Pa. Jan. 14, 1992) (denying privilege claim because officer failed to meet burden of presenting evidence to satisfy the Bevill test).

Moreover, the First, Second, Ninth and Tenth Circuits have referred to Bevill as the controlling authority in the Third Circuit in cases where an employee seeks to assert the attorney-client privilege to bar disclosure by the corporation of privileged communications after the corporation has waived the attorney-client privilege. See In re Grand Jury Subpoena, 274 F.3d 563, 571 (1st Cir. 2001) (adopting the reasoning and test in Bevill); United States v. Int'l Bhd. of Teamsters, 119 F.3d 210, 215 (2d Cir. 1997) (listing Bevill requirements and stating the corporate officer could not meet them in that case); United States v. Ruehle, 583 F.3d 600, 608 n.7 (9th Cir. 2009) (noting, but not adopting Bevill's standard); Grand Jury Proceedings v. United States, 156 F.3d 1038, 1041 (10th Cir. 1998) (finding that the district court incorrectly applied the fifth prong of the Bevill standard).

B. Application of the Bevill Factors

Defendant has not satisfied that he sought legal advice or representation from the Law Firm in general or from Keany specifically.

First, Norris did not approach the Law Firm or Keany for legal representation. The evidence showed that the Law Firm was contacted by Morgan (an existing client of the Law Firm); through Peppers, to represent it during the grand jury investigation. At no time, did Norris ask the Law Firm or Keany specifically to represent him personally during the grand jury

investigation.[2] The conversation between Peppers and Norris where Norris asked Peppers whether Keany could "continue to represent him," is not to the contrary. That conversation reportedly occurred in late September 2001, a month prior to the termination of the Law Firm's representation of Morgan, and long after the scripts had been produced by Morgan to the grand jury. Bevill, 805 F.2d at 123 (prongs #1 & 2); see Findings of Fact ¶¶ 2-4; 22-24.

Second, at no time did Keany think that he was representing Norris individually. In fact, at some point during Keany's representation of Morgan, he advised Norris that he should retain separate counsel. Bevill, 805 F.2d at 123 (prong #3); see Finding of Fact ¶ 24.

Third, the conversations between Norris and Keany only involved matters within Morgan or the business affairs of Morgan. At the hearing, Norris failed to adduce any conversation with Keany which was confidential or which dealt with Norris' personal liability or criminal exposure as opposed to Morgan's. Bevill, 805 F.2d at 123 (prongs #4 & 5); see Finding of Fact ¶ 25.

Defendant's position on the issue of Keany's representation is two fold. First, Norris points to the July 31, 2001, letter to the Antitrust Division where Keany writes, "[w]e presumptively also represent all current employees of the companies in connection with the matter. . . . Should you wish to call other current employees [to the grand jury], I assume that

---

[2] Peppers is not a totally disinterested party since, as he testified, Peppers is a personal friend of Norris.

we would also represent those individuals." Letter from Sutton Keany to Lucy P. McClain, dated July 31, 2001. The force of this letter is unclear, but by no means establishes that the representation was individual rather than corporate. First, the use of the words "presumptively" and "I assume we would represent all [of Morgan's] employees" appears to refer to a future decision to be made, if and when, the employees, including Norris, were called before the grand jury. Second, the letter was addressed to the Antitrust Division and appeared designed to designate Keany as the contact person in the event the grand jury issued subpoenas, rather than an entry of appearance on behalf of unnamed and unidentified employees.

Defendant's second argument in support of his claim of attorney-client privilege is that Peppers testified that Norris asked Peppers if Keany would continue to represent him (Norris). Defendant has not presented evidence that Norris did, in fact, ask Keany to represent him individually or that Keany ever agreed to represent Norris individually. As discussed above, the exchange occurred in late September 2001: (1) shortly before Keany's representation of Morgan ended (October or November 2001) and (2) long after the documents at issue had been produced (December 21, 2000).

While establishment of an attorney-client relationship "is not dependent . . . upon execution of a formal contract," the burden of demonstrating that a privileged relationship exists nonetheless rests on the party who seeks to assert it. <u>See</u>

United States v. Costanzo, 625 F.2d 465, 468 (3d Cir. 1980).

Under these circumstances, Defendant can claim no attorney-client privilege which would bar Keany's testimony at trial or which would trump Morgan's waiver of the attorney-client privilege.[3]

C. Relevance of Keany's testimony

Keany's testimony would include: (1) when Keany interviewed Norris and his subordinates in connection with the internal investigation, they all told him the same story they had agreed to tell about their price-fixing meetings; (2) Norris and Coker authorized him to provide the meeting summaries to the Government; and (3) he provided these summaries, later determined to be false, to the Government. This testimony is directly relevant to the obstruction of justice charges and Defendant's role in the events. Accordingly, a jury could infer from this evidence Defendant's intent to obstruct justice. Thus, evidence of Defendant's role in the obstruction of justice scheme is necessary to prove the essential elements of the charged offense. Fed. R. Evid. 402. Finally, given the importance of the

---

[3] There are two additional grounds which counsel in favor of denying the Defendant's motion to suppress. First, because Defendant did not create the scripts himself, and the scripts were distributed to several people within the company, he lacks standing to prevent Morgan from waiving the privilege. United States v. Rockwell Intern., 897 F.2d 1255, 1265 (3d Cir. 1990). Second, to the extent the crime-fraud exception applies, it does appear that the Government has made a prima facie showing that Norris was intending to commit a fraud and that the attorney-client communications were in furtherance of that alleged crime or fraud. See In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000).

testimony, the probative value is not substantially outweighed by the dangers of unfair prejudice, confusion to the jury or waste of time.  Fed. R. Evid. 403.

**IV. CONCLUSION**

For the reasons set forth above, the Court will deny Defendant's motion to suppress and grant the Government's motion to permit the testimony of Sutton Keany.  An appropriate order follows.