IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :    CRIMINAL ACTION
                            :    NO. 03-632
      v.                   :
                            :
IAN NORRIS                 :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                NOVEMBER 30, 2010

TABLE OF CONTENTS

I.   INTRODUCTION.............................................2
II.  BACKGROUND...............................................3
III. MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29...........6
    A.  Legal Standard......................................6
    B.  Discussion..........................................8
         1.  Import of Defendant's Acquittal on the Objects of
             the Charged Conspiracy.........................9
         2.  Sufficiency of the Evidence to Establish a
             Conspiracy Conviction for Either of the Charged
             Objects.......................................11
             i.  The Evidence Pertaining to Section
                 1512(b)(1).................................12
                 a.  Appropriate legal standard...........13
                 b.___Sufficiency of the evidence based on the
                    applicable legal standard.............23
             ii. The Evidence Pertaining to Section
                 1512(b)(2)(B)..............................28
         3.  Validity of the Charge for Which Defendant was
             Convicted.....................................33
IV.  MOTION FOR A NEW TRIAL UNDER RULE 33.....................36
    A.  Defendant's Argument that the Verdict is Against the
      Weight of the Evidence.............................37
         1.  Legal Standard................................37
          2.  Discussion....................................38
    B.  Defendant's Argument that Fundamental Errors were
      Committed During Trial.............................44
         1.  Legal Standard................................45
          2.  Errors in the Jury
             Instructions..................................45
             i.  Failure to Identify the Overt Acts Defendant
                 Took in Furtherance of the Conspiracy......47
             ii. Alleged Constructive Amendment of the

                    Indictment via the Preliminary
                    Instructions...............................50
              iii.  Failure to Give an Instruction on the Right
                    to Withhold Testimony......................53
              iv.   Alleged Error in the "Nexus" Requirement
                    Instruction................................55
              v.    Failure to Distinguish in the Instructions
                    Between "Influencing" and
                    "Preventing"...............................57
              vi.   Failure to Give a Missing Witness
                    Instruction................................60
        3.    Attorney Testimony in Violation of Defendant's
              Attorney-Client Privilege........................63
        4.    Failure to Comply with Discovery
              Obligations......................................70
              i.    Legal Standard.............................71
              ii.   Discussion.................................72
        5.    Prosecutorial Misconduct in the Antitrust
              Division's Closing Argument and
              Rebuttal.........................................76
              i.    Reference to Facts Outside the
                    Record.....................................77
              ii.   Turning the Verdict into a Referendum on the
                    Prosecutor's Work on the
                    Case.......................................80
V.    CONCLUSION.............................................86

**I.    INTRODUCTION**

        Defendant, Ian Norris ("Defendant"), is a national of

the United Kingdom who is subject to prosecution in the United

States under an extradition agreement.  On September 28, 2004, a

federal grand jury returned the second superseding indictment

("Indictment") against Defendant.  The Indictment followed an

investigation of an international conspiracy to fix the price of

carbon products.  It charged Defendant with four counts:  (1)

Count One—violating the Sherman Act; (2) Count Two—conspiring, in

violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 1512(b)(1)

and 18 U.S.C. § 1512(b)(2)(B); (3) Count Three—violating 18

U.S.C. § 1512(b)(1); and (4) Count Four—violating 18 U.S.C. §

1512(b)(2)(B). Because Defendant's extradition order barred

prosecution under the Sherman Act, Defendant was only tried on

Counts Two, Three, and Four. Following a seven day trial, the

jury found Defendant guilty on Count Two, but acquitted Defendant

on Counts Three and Four. Presently before the Court is

Defendant's motion for a judgment of acquittal or, in the

alternative, a new trial.

For the reasons discussed below, the Court will deny

Defendant's motion.


**II.  BACKGROUND**

Because the Court has already outlined the background

surrounding this case, see United States v. Norris, --- F. Supp.

2d ----, No. 03-632, 2010 WL 2553620 (E.D. Pa. June 22, 2010)

("Norris I"), it is unnecessary to recite those facts at any

length. In short, Defendant was charged with obstructing justice

in violation of Section 1512(b)(1) and Section 1512(b)(2)(B) and

conspiring to do the same:

> The Indictment alleges that, in carrying out this conspiracy,
> the Defendant and his co-conspirators: (1) provided false and
> fictitious relevant and material information in response to
> the grand jury investigation; (2) prepared a written "script"
> which contained false information which was to be followed by
> anyone questioned by either the Antitrust Division or the
> federal grand jury; and (3) distributed the script to others
> who had information relevant to the grand jury investigation

> with instructions to follow the script when answering
> questions posed by either the grand jury or the Antitrust
> Division. Moreover, the Indictment alleges that the
> conspirators removed, concealed, or destroyed from business
> files any documents which contained evidence of an
> anticompetitive agreement or reflected contacts between or
> among competitors, and persuaded, directed and instructed
> others to do the same.

Id. at *2. The scripts Defendant participated in creating sought to cast as legitimate price-fixing meetings between Morgan, the carbon products company for whom Defendant served as CEO during the time in question, and three of its competitors; namely, (1) Carbone; (2) Schunk; and (3) Hoffman.

Defendant's trial began on July 13, 2010. The Antitrust Division called nine witnesses in support of its case: (1) Robin Emerson; (2) Melvin Perkins; (3) Donald Muller; (4) Jack Kroef; (5) Thomas Hoffman; (6) Heinz Volk; (7) Sutton Keany; (8) William Macfarlane; and (9) Helmut Weidlich. Perkins, Kroef, Muller, Macfarlane and Emerson were Morgan employees who worked with Defendant in varying capacities. Volk and Weidlich were Schunk employees. Hoffman was responsible for Hoffman's United States operations. Keany was the attorney who conducted an investigation into Morgan's price-fixing involvement after Morgan's United States subsidiary, Morganite, was served with a grand jury subpoena on April 27, 1999.

After the Antitrust Division rested, Defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). The Court denied Defendant's motion.

Thereafter, Defendant called one witness, Michael Cox, who was also a Morgan employee during the time in question. On July 22, 2010, the Court charged the jury. As to Count Two, the verdict form the Court provided asked the jury to determine whether Defendant was guilty of conspiracy to obstruct justice for either of the following two reasons:

(a) knowingly corruptly persuading or knowingly attempting to corruptly persuade other[] persons with intent to influence their testimony in the grand jury proceeding in the Eastern District of Pennsylvania; or (b) knowingly corruptly persuading or knowingly attempting to corruptly persuade other persons with intent to cause or induce those other persons to destroy or conceal records and documents with the intent to impair the availability of those records and documents for use in the grand jury proceeding.

(Doc. no. 149.)

Three business days later, on July 27, 2010, the jury returned a verdict finding Defendant guilty on Count Two of the Indictment. Thus, the jury found Defendant conspired to violate either Section 1512(b)(1) or Section 1512(b)(2)(B). The jury, however, acquitted Defendant on the substantive charges of violating both of those statutes as charged in Counts Three and Four. Pointing to this apparent inconsistency and raising a variety of other issues for this Court to resolve,[1] Defendant now

---

[1] Defendant's opening memorandum contains 175 substantive pages totaling roughly 60,000 words. Defendant has also moved for leave to file a reply memorandum, submitting a proposed memorandum containing 105 substantive pages totaling roughly 35,000 words. This type of indiscriminate advocacy, lacking a sense of priority or proportion, has not been helpful to the Court in clarifying the issues subject to post-trial review. See

moves for a judgment of acquittal under Rule 29 of the Federal
Rules of Criminal Procedure or, alternatively, a new trial under
Rule 33 of the Federal Rules of Criminal Procedure.  The
respective arguments are addressed in turn.


**III. MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29**

    A.   <u>Legal Standard</u>

       In deciding a motion for a judgment of acquittal under
Rule 29, the court views the evidence introduced at trial in the
light most favorable to the Government and upholds the jury's
verdict so long as any rational trier of fact "'could have found
proof of guilt beyond a reasonable doubt based on the available
evidence.'"  <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir.
2002) (quoting <u>United States v. Wolfe</u>, 245 F.3d 257, 262 (3d Cir.
2001)).  "The court is required to 'draw all reasonable
inferences in favor of the jury's verdict.'"  <u>Id.</u> (quoting <u>United
States v. Anderskow</u>, 88 F.3d 245, 251 (3d Cir. 1996)).  The court

--------

<u>Marson v. Jones & Laughlin Steel Corp.</u>, 87 F.R.D. 151, 152 n.*
(E.D. Wis. 1980) ("(1) The story of the creation of the world is
told in the book Genesis in 400 words; (2) The world's greatest
moral code, the Ten Commandments, contains only 279 words; (3)
Lincoln's immortal Gettysburg address is but 266 words in length;
(4) The Declaration of Independence required only 1,321 words to
establish for the world a new concept of freedom.  Together, the
four contain a <u>mere 2,266 words</u>." (emphasis added)).
Nevertheless, in the interests of justice and given that the
Antitrust Division was afforded an opportunity to surreply, the
Court will grant Defendant's motion for leave to file the reply
memorandum and consider the arguments advanced therein.

may not "usurp the role of the jury" by weighing the evidence or assessing the credibility of witnesses. United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (citing United States v. Jannotti, 673 F.2d 578, 581 (3d Cir. 1982) (en banc); and 2A Charles A. Wright, Federal Practice & Procedure (Crim. 3d) § 467, at 311 (2000)). Thus, the defendant bears an "extremely high" burden when challenging the sufficiency of the evidence supporting a jury verdict, United States v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008) (internal marks omitted) (quoting United States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005)), and the Government "may defeat a sufficiency-of-the-evidence challenge on circumstantial evidence alone." Id. at 156 (citing United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006)). A finding of insufficiency should therefore "'be confined to cases where the prosecution's failure is clear.'" Smith, 294 F.3d at 477 (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

Where, as here, the indictment charges a conspiracy to commit several federal crimes, the jury's verdict will be upheld so long as the jury could rationally find the defendant conspired to commit at least one of the crimes at issue. See Griffin v. United States, 502 U.S. 46, 59-60 (1991) (concluding a general guilty verdict on a multiple-object conspiracy charge may stand even if there is insufficient evidence as to one object of the

alleged conspiracy); Mod. Crim. Jury Instr. 3d Cir. 6.18.371C

("The government . . . must prove that [the conspirators] agreed

to commit at least one of the object crimes . . . ."). Thus, to

prevail on his motion for a judgment of acquittal, Defendant must

establish that no rational jury could find beyond a reasonable

doubt that Defendant conspired to violate either Section

1512(b)(1) or Section 1512(b)(2)(B). That is, that Defendant

conspired to either (1) knowingly corruptly persuade or knowingly

attempt to corruptly persuade other persons with the intent to

influence their testimony in the relevant grand jury proceedings;

or (2) knowingly corruptly persuade or knowingly attempt to

corruptly persuade other persons with the intent to cause or

induce those persons to destroy or conceal records and documents

for use in the relevant grand jury proceedings.

B. <u>Discussion</u>

Defendant contends that no rational jury could find him

guilty for conspiracy under this standard. Defendant advances

three overarching arguments in support of this contention: (1)

that Defendant's conviction is inherently suspect in view of the

jury's acquittals on the two substantive counts comprising the

objects of the conspiracy; (2) that the evidence does not suffice

to establish conspiracy convictions for the objects of the

charged conspiracy; and (3) that the jury may have convicted

Defendant of a legally inadequate charge. These arguments are

considered in that order.

1.  Import of Defendant's Acquittal on the Objects of
    the Charged Conspiracy

As a preliminary matter, Defendant argues that "special
scrutiny is required where a defendant is acquitted of the
substantive charges alleged to be the object of the conspiracy"
because such acquittals suggest the government did not fulfil its
obligation "to prove the intent necessary to commit the
underlying substantive offense."  (Def.'s Mot. for Acquittal or,
in the Alternative, a New Trial, at 12, 13.)  Defendant urges
this is particularly true in this case because the overt acts of
the conspiracy charged in the Indictment are similar to the facts
supporting the substantive offenses for which Defendant was
acquitted.  In essence, then, Defendant suggests the Court should
be skeptical of the jury's verdict because it is inconsistent.

However, it has never been the case that an
inconsistent jury verdict is, in itself, cause for judicial
skepticism.  On the contrary, it is well settled that
inconsistent jury verdicts in criminal cases are not subject to a
heightened standard of review.  See United States v. Powell, 469
U.S. 57, 64 (1984) ("'[T]he most that can be said . . . is that
the [inconsistent] verdict shows that either in the acquittal or
the conviction the jury did not speak their real conclusions, but
that does not show that they were not convinced of the
defendant's guilt.'" (quoting Dunn v. United States, 284 U.S.

9

390, 393 (1932))); see also United States v. Vastola, 989 F.2d
1318, 1329 (3d Cir. 1993) ("[J]ury verdicts cannot be set aside
solely on the ground of inconsistency.").

Indeed, in United States v. Powell, the Supreme Court
held that acquittals on charges of cocaine possession and
conspiracy to possess cocaine did not require reversal of the
defendant's conviction for "using the telephone in 'committing
and in causing and facilitating'" the conspiracy and possession
for which the defendant was acquitted.  469 U.S. at 60, 69.  In
so holding, the Court noted:

> [I]nconsistent verdicts—even verdicts that acquit on a
> predicate offense while convicting on the compound
> offense—should not necessarily be interpreted as a windfall to
> the Government at the defendant's expense.  It is equally
> possible that the jury, convinced of guilt, properly reached
> its conclusion on the compound offense, and then through
> mistake, compromise, or lenity, arrived at an inconsistent
> conclusion on the lesser offense.

Id. at 65.

This rule is no different in conspiracy cases.  In
United States v. Vastine, for example, the defendant attacked the
jury's verdict arguing that a conspiracy conviction should be set
aside insofar as the defendant was found not guilty on the
substantive offenses.  363 F.2d 853, 854 (3d Cir. 1966).  As in
this case, the conspiracy charge in Vastine charged the defendant
with conspiracy to commit the substantive offenses for which the
defendant was acquitted.  Id.  Nevertheless, the Vastine Court
refused to reverse the jury's verdict and rejected the

10

defendant's challenge.  Thus, the fact that the jury acquitted Defendant on the objects of the charged conspiracy neither triggers any heightened standard of review nor requires this Court to enter a judgment of acquittal.

> 2.  <u>Sufficiency of the Evidence to Establish a Conspiracy Conviction for Either of the Charged Objects</u>

Defendant next argues that the evidence was not sufficient for a rational jury to find Defendant guilty on the conspiracy charge.  The grounds raised by Defendant are substantially similar to those made in the Rule 29 motion this Court denied after the Antitrust Division rested.  Although the Court's denial of that motion does not preclude the Court from granting the instant Rule 29 motion, <u>see generally</u> Fed. R. Crim. P. 29, the Court will deny Defendant's motion for the same reasons it denied Defendant's earlier motion for a judgment of acquittal; namely, because the facts at trial sufficiently support the conclusion that Defendant conspired, within the meaning of 18 U.S.C. § 371, to violate either Section 1512(b)(1) or Section 1512(b)(2)(B).

Under Section 371, a defendant is guilty of conspiracy where:

> [T]wo or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy . . . .

18 U.S.C. § 371.  Accordingly, to convict a defendant of
conspiracy, the jury must find beyond a reasonable doubt:  (1)
"an agreement, either explicit or implicit"; (2) "to commit an
unlawful act"; (3) "with intent to commit an unlawful act"; and
(4) "intent to commit the underlying offense."  Brodie, 403 F.3d
at 134 (internal marks omitted) (quoting United States v. Kapp,
781 F.2d 1008, 1010 (3d Cir. 1986)).  With these elements in
mind, the analysis that follows considers whether, viewing the
facts at trial in the light most favorable to the Antitrust
Division, a rational jury could find beyond a reasonable doubt
that Defendant conspired to violate either Section 1512(b)(1) or
Section 1512(b)(2)(B).

       i.   The Evidence Pertaining to Section 1512(b)(1)

      The Indictment charged Defendant with conspiring to
violate Section 1512(b)(1) by agreeing with others "to corruptly
persuade and attempt to corruptly persuade other persons known to
the Grand Jury with intent to influence their testimony in an
official proceeding."  (Indictment ¶ 13.)  Defendant asserts that
the evidence was insufficient to establish such a conspiracy
because the evidence did not show (1) an agreement to influence
grand jury testimony; or (2) the requisite intent to commit the
underlying offense.  Relying on United States v. Schramm, 75 F.3d
156 (3d Cir. 1996), Defendant principally contends that he could
not be guilty because the evidence at trial demonstrated—at

12

most—an agreement to lie to the Antitrust Division or to Morgan's lawyers. This evidence, Defendant reasons, does not suffice because it does not show that Defendant targeted the grand jury investigation in the Eastern District of Pennsylvania. See id. at 159 (holding that a defendant subject to a conspiracy prosecution must know that the agreement "had the specific unlawful purpose charged in the indictment").

Although presented as a novel legal issue for this Court's consideration, Defendant's argument boils down to how one interprets the facts proven at trial: Defendant believes they do not tend to show the conspiracy charged. This belief is rooted, in part, in a faulty conception of what a violation of Section 1512(b)(1) entails. The Court thus begins by laying out the appropriate legal standard.

a.    Appropriate legal standard

Defendant's first argument that there was no evidence of an agreement is based on the terms "other persons" and "Grand Jury" as used in the Indictment. (See Indictment ¶ 13.) Emphasizing these terms, Defendant asserts that the evidence at trial merely demonstrated an agreement amongst the co-conspirators as to what they would say if questioned by the Antitrust Division or their own lawyers. Thus, according to Defendant, there was no evidence of an agreement to corruptly persuade other persons to influence the grand jury proceedings in

13

the Eastern District of Pennsylvania.

Defendant's second argument that the evidence did not sufficiently demonstrate the intent necessary to commit the underlying offense is grounded in Defendant's insistence that United States v. Aguilar, 515 U.S. 593 (1995) governs and requires a defendant to know his or her actions will affect an official proceeding for a Section 1512(b) violation to lie.[2]  In

---

[2]     For ease, this memorandum refers to the intent and nexus required for a "Section 1512(b)" violation when discussing that required for a violation of Section 1512(b)(1) or Section 1512(b)(2)—the two statutes Defendant was convicted of conspiring to violate—because courts have generally applied the same requirements to both.  See infra note 5.  However, it is not necessarily the case that all of the offenses in Section 1512(b) require the same nexus required for a violation of either Section 1512(b)(1) or Section 1512(b)(2).

Section 1512(b)(3), which punishes defendants who "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States," 18 U.S.C. § 1512(b)(3), does not—as Sections 1512(b)(1) and 1512(b)(2) do—require the obstruction at issue to relate to an "official proceeding." Based on this, some courts have concluded that the nexus required for a Section 1512(b)(3) violation differs from that which applies to a violation of subsections (1) and (2).  In United States v. Ronda, for example, the Eleventh Circuit distinguished the nexus required for a violation of the two statutes, concluding that the nexus requirement the Supreme Court enunciated in Arthur Andersen LLP v. United States, 544 U.S. 696 (2005) with respect to Section 1512(b)(2) does not apply to a Section 1512(b)(3) violation:

   [T]he federal nexus required under § 1512(b)(2) is distinct from that required under § 1512(b)(3).  Unlike the stricter "an official proceeding" requirement that appears in § 1512(b)(2), § 1512(b)(3) requires only that a defendant intended to hinder, delay, or prevent communication to any "law enforcement officer or judge of the United States."

14

that case, the Supreme Court held that the intent required for a violation of 18 U.S.C. § 1503 was not established where the defendant made a false statement to an investigating agent who had alerted the defendant to the existence of a grand jury investigation. The Court held as much because the connection between the defendant's statement and the grand jury investigation was tenuous; the statement was a mere lie to an investigating agent who had "not been subpoenaed or otherwise directed to appear before the grand jury." Aguilar, 515 U.S. at 601. Applying Aguilar, Defendant contends he could not have had the intent required because he and his co-conspirators did not know their actions would influence grand jury testimony.

As noted, the legal underpinnings upon which both of Defendant's Section 1512(b)(1) arguments depend are flawed. First, Defendant's contention that there was no agreement to corruptly persuade another person to influence grand jury proceedings draws too narrow an interpretation of Section 1512(b)(1). Indeed, by stating the conspiracy charge cannot lie because the evidence merely showed that Defendant and his co-conspirators agreed to mislead the company lawyers or the Antitrust Division, Defendant appears to assume that Section 1512(b)(1) cannot be violated by deliberately using such parties

Ronda, 455 F.3d 1273, 1288 (11th Cir. 2006) (quoting United States v. Veal, 153 F.3d 1233, 1248 (11th Cir. 1998)).

as a conduit to ultimately influence testimony at contemplated

grand jury proceedings.[3]  But there is no reason it could not be.

After all, the statute expressly provides "an official

proceeding need not be pending or about to be instituted at the

time of the offense."  18 U.S.C. § 1512(f)(1).  For this reason,

a defendant violates Section 1512(b)(1) when he or she corruptly

persuades another person with the intent to influence testimony

in an official proceeding—not when the testimony of the party in

question is actually used in the official proceeding.[4]  <u>Cf.</u>

---

[3]     At oral argument, however, Defendant conceded that a
Section 1512(b)(1) violation could lie under these circumstances.
Nevertheless, Defendant claimed the Indictment in this case was
more restrictive than the statute because it charged Defendant
with conspiring to corruptly persuade "<u>other persons</u> . . . with
intent to influence <u>their testimony</u>."  (Indictment ¶ 13 (emphasis
added).)  The Court disagrees with Defendant's interpretation of
the language in the Indictment.  By its terms, it permits a
conviction where the defendant uses an intermediary to corruptly
persuade another person with the intent to influence their
testimony.

[4]     Defendant, reasoning that the evidence at trial more
neatly establishes a violation of Section 1512(b)(3) than a
violation of Section 1512(b)(1), seems to base his interpretation
of Section 1512(b)(1) on the existence of Section 1512(b)(3)—a
different crime for which Defendant was not indicted.  As
mentioned <u>supra</u> note 2, Section 1512(b)(3) provides for criminal
sanctions where one corruptly persuades another with the intent
to "hinder, delay, or prevent the communication to a law
enforcement officer."  18 U.S.C. § 1512(b)(3).  It is undeniable
that the offenses in the two subsections are different.  <u>See</u>
<u>United States v. Floresca</u>, 38 F.3d 706, 709, 710 n.9 (4th Cir.
1994) (reversing the defendant's conviction because the district
court inappropriately instructed the jury on Section 1512(b)(3)
where the defendant had actually been charged with a violation of
Section 1512(b)(1)).  However, the existence of Section
1512(b)(3) does not preclude a conviction under Section
1512(b)(1) where the defendant engages in activity that is

United States v. DiSalvo, 631 F. Supp. 1398, 1402 (E.D. Pa. 1986)

(discussing statutory change in Section 1512 from proscribing

persuasion of "any witness" to "any person"), aff'd, 826 F.2d

1057 (3d Cir. 1987).  And, as the statute itself reveals, a

defendant who seeks to influence testimony at a proceeding by

corruptly persuading that person through another could be guilty

under the statute.  See 18 U.S.C. § 1512(b)(1) (defendant

violates the statute if he or she "corruptly persuade[s] another

person . . . with intent to . . . influence, delay, or prevent

the testimony of any person . . . ." (emphasis added)).

Second, although the parties vigorously argue over

whether United States v. Aguilar is controlling as to the nexus

required in the instant case, the Court need not conclusively

resolve this issue because Defendant misconstrues Aguilar to

require a greater knowledge of likelihood to affect official

proceedings.  In United States v. Aguilar, the defendant was

charged with violating Section 1503 by lying to an FBI agent.

The Court ruled that a violation under Section 1503 required a

"nexus" with judicial proceedings—namely, that the defendant's

criminal conduct "have a relationship in time, causation, or

logic with the judicial proceedings" such that there is a

"natural and probable . . . interfer[ence] with the due

administration of justice."  515 U.S. at 599 (internal marks

punishable under the latter statute.

17

omitted) (quoting <u>United States v. Wood</u>, 6 F.3d 692, 695 (10th Cir. 1993)).

In reaching this conclusion, the Court rejected the government's contention that the defendant in <u>Aguilar</u> had the knowledge required for a Section 1503 violation based on a conversation between the defendant and an FBI agent in which the agent stated, in response to the defendant's inquiry concerning a grand jury investigation, that a grand jury would indeed be convening. <u>Id.</u> at 600. According to the Court, this conversation did not demonstrate that the defendant "knew his false statement would be provided to the grand jury." <u>Id.</u> at 601. Thus, the Court concluded the probability of the defendant's lie reaching the grand jury was too speculative as to have the required relationship with the proceeding in question. <u>Id.</u>

Defendant, pointing to the language in <u>Aguilar</u> concerning the defendant's lack of knowledge that the false statement to the FBI agent would be conveyed to the grand jury, appears to read <u>Aguilar</u> to impose a nexus whereby a defendant must know grand jury testimony will be impacted by his or her conduct. <u>Aguilar</u>, however, quite clearly held the nexus merely requires a "'natural and probable effect' of interfering with the due administration of justice." <u>Id.</u> A defendant, therefore, need not—as Defendant suggests—affirmatively "kn[ow] that his

conduct would affect grand jury testimony." (Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 35; see also id. ("There was no evidence that Mr. Norris or any alleged co-conspirator had knowledge that the statements they made . . . would somehow morph into testimony before the grand jury.").) It is enough for that to be the defendant's intention where he or she acts in a way that is likely to achieve the desired objective. See United States v. Kumar, 617 F.3d 612, 621 (2d Cir. 2010) (interpreting Section 1503 and explaining "a defendant does not need to know with certainty that his conduct would affect judicial proceedings"); United States v. Macari, 453 F.3d 926, 940 (7th Cir. 2006) (applying Aguilar in evaluating defendant's motion for a judgment of acquittal and holding the evidence sufficed because the defendant "made the statements with the intention of obstructing the grand jury's investigation because there was a logical relationship between his knowing conduct . . . and the effect it was likely to have").

Moreover, it is not clear that the nexus articulated in Aguilar applies to the instant statute at all. In Arthur Andersen LLP v. United States, the Court determined that Section 1512(b) requires a nexus as a condition precedent to criminal punishment. 544 U.S. at 708.[5] In support of this conclusion,

---

[5] The Arthur Andersen Court applied the nexus requirement to Section 1512(b)(2). However, courts have interpreted the nexus requirement to apply with equal force to Section

19

the Court cited <u>Aguilar</u> and clarified that the <u>Aguilar</u> decision
had "required something more—specifically, a 'nexus' between the
obstructive act and the proceeding." 544 U.S. at 708 (citing
<u>Aguilar</u>, 515 U.S. at 599-600). Some courts have concluded the
nexus required by <u>Arthur Andersen</u> is substantially similar to
that in <u>Aguilar</u>. <u>See</u> <u>United States v. Hayes</u>, No. 09-397, 2010 WL
2696894, at *4 (M.D. Pa. July 7, 2010) (stating <u>Arthur Andersen</u>
requires "essentially the nexus mandated by <u>Aguilar</u>"). However,
the <u>Arthur Andersen</u> Court did not adopt precisely the same nexus
requirement—it merely stated that one is required and that the
defendant must have some contemplation of the official proceeding
he or she is charged with obstructing. <u>See</u> <u>Arthur Andersen</u>, 544
U.S. at 708 (explaining there must be some "contemplation [of an]
official proceeding"); <u>United States v. Byrne</u>, 435 F.3d 16, 25
(1st Cir. 2006) ("[T]he <u>Arthur Andersen</u> court did not elaborate
on the particularity required by the nexus requirement in
subsection (b)(2).").

Based on the considerable difference between the two
statutes, it is debatable whether the nexus required for a
Section 1512(b) violation is the same as that associated with a
Section 1503 violation. For one, as Section 1512 expressly
instructs, "an official proceeding need not be pending or about

---

1512(b)(1). <u>See, e.g.</u>, <u>United States v. LeMoure</u>, 474 F.3d 37, 44
(1st Cir. 2007) ("[S]ection 1512(b)(1) requires proof of a nexus
with 'an official proceeding' . . . .").

to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1). There is no such statutory prescription with respect to Section 1503. Indeed, in ruling that a nexus was required for a Section 1512(b) violation, the Arthur Andersen Court acknowledged this very point. See Arthur Andersen, 544 U.S. at 707-08 ("It is, however, one thing to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,' and quite another to say a proceeding need not even be foreseen.").

In addition, the provision of Section 1503 dealt with in Aguilar is considerably broader than Section 1512(b) in terms of what it allows the government to punish. See Aguilar, 515 U.S. at 598 (explaining that the Section 1503 provision being interpreted "serves as a catchall" and contains portions that are "general in scope"). This breadth, which Section 1512(b) plainly does not share,[6] was one of the reasons the Aguilar Court required the nexus that it did. See id. at 600 ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute . . . . We do not believe that uttering false statements to an investigating agent . . . who might or

_____

[6]    Section 1503 criminalizes a defendant's conduct where he or she "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). Section 1512(b), by contrast, is—as defense counsel acknowledged at oral argument—more targeted.

21

might not testify . . . is sufficient to make out a violation of the catchall provision.").

Thus, the Court disagrees with Defendant's interpretation that the <u>Aguilar</u> nexus requires a defendant to have actual knowledge that his or her actions will end up affecting the relevant official proceeding. However, to the extent <u>Aguilar</u> requires such a nexus, the Court deems it inapplicable here because Defendant was charged with violating (and conspiring to violate) Section 1512(b) rather than Section 1503. Consequently, Defendant and his co-conspirators need not have known with certainty that their actions would influence grand jury testimony for a violation of the statute to lie.[7]

---

[7] Defendant also asserts that the knowledge required for a Section 1512(b)(1) violation was lacking because Defendant and his co-conspirators lacked a technical understanding of what a grand jury is and therefore could not have known that the people influenced could be called to testify. Defendant is mistaken to the extent his argument implies that a technical understanding is required for a Section 1512(b)(1) violation. Instead, as noted, a defendant violates Section 1512(b)(1) where his or her illegal actions are undertaken in contemplation of an official proceeding with the purpose of influencing testimony in it.

Moreover, the evidence presented belies Defendant's theory that he and his co-conspirators did not know people could be called to testify before the grand jury. Testimony was heard that Defendant had a subpoena in his possession at the conception of Defendant's obstruction scheme. (Tr. 4:20-22 (July 14, 2010 P.M.).) This subpoena was titled "SUBPOENA TO TESTIFY BEFORE GRAND JURY" and had a box to check indicating whether the subpoena was for a "person" or for "documents or objects." (See GX-05.) Consequently, the alleged cultural misconceptions of the grand jury process that Defendant cites are of no moment; a rational jury could conclude Defendant and his co-conspirators were aware people could be called to testify in the grand jury

b.  <u>Sufficiency of the evidence based on the</u>
<u>applicable legal standard</u>

With the appropriate legal framework in mind, it is
evident that a rational jury could, viewing the facts in the
light most favorable to the Antitrust Division, find beyond a
reasonable doubt that Defendant conspired to violate Section
1512(b)(1).  The evidence produced at trial readily demonstrates
that, after learning of the grand jury investigation, Defendant
and others agreed to misrepresent Morgan's meetings with
competitors via false non-contemporaneous scripts they and others
were to parrot when questioned.  Thus, a rational jury could find
these scripts were for the express purpose of influencing
testimony that might be presented to the grand jury.

It could do so because the script production described
by the Antitrust Division's nine witnesses is traceable to the
April 27, 1999 grand jury subpoena that was served on Morganite.
The subpoena, titled "SUBPOENA TO TESTIFY BEFORE GRAND JURY"
indicated that the company was to turn over responsive "documents
or object(s)."  (<u>See</u> GX-05.)  After the subpoena was served, a
meeting was arranged in Defendant's office to discuss the
subpoena.  (<u>See</u> Tr. 4:7-11 (July 14, 2010 P.M.).)  Several Morgan
employees attended this meeting and, upon arriving, were shown a
copy of the subpoena.  (<u>See</u> <u>id.</u> 4:20-22.)

_____

proceedings.

As Perkins, Morganite's Vice President of Sales and Marketing stated, he met with Defendant, Macfarlane, and Kroef after the issuance of the subpoena and was told "the potential problem . . . was the investigation, and the concern that there were no written notes or documents . . . relative to the meetings." (Id. 113:24-114:3.)  To remedy this problem, Defendant suggested that false meeting summaries be manufactured:

> There was a decision taken that we should draft some notes of the meetings which involved really digging -- digging a lot of information up first of all to find out when the meetings were, who the potential attendees were, and then to draft meetings but on instruction to be very careful what we wrote, how we phrased things and what we included in the drafts we were going to prepare.
>
> . . .
>
> [W]e were to de-emphasize references to any pricing involvement or pricing arrangements. . . .  The emphasis was to make it more seem as though they were joint venture meetings.

(Id. 114:14-20; 115:22-23; 115:25-116:1.)  The purpose of these scripts were to "help each of us that were -- attended the meetings in terms of misleading the Department of Justice."  (Tr. 31:21-23 (July 20, 2010 A.M.).)  They were, in Kroef's words, to form a "new memory" in the event "you would be questioned" in connection with the investigation.  (Tr. 12:23-13:3, 14:7-8 (July 16, 2010 A.M.).)

Several other witnesses told the same story at trial. (See, e.g., Tr. 109:1-10; 112:8-12 (July 15, 2010 P.M.) (Kroef's testimony that, after receiving the grand jury subpoena, there

were meetings between Defendant and others in which it was determined evidence should be created to show that "it wasn't cartel meetings, that these were meetings on other topics which were allowed to take place"); Tr. 4:20-22, 28:17-19 (July 20, 2010 A.M.) (Macfarlane's testimony that Defendant had the grand jury subpoena at the initial meeting and that the set of notes prepared were "designed to mislead the -- investigation by the U.S. Department of Justice").)  This evidence supports a jury finding that Defendant and others took actions to prevent the grand jury's information gathering process after learning about the grand jury investigation for the purpose of influencing testimony they believed might be given to the grand jury—i.e., with the knowledge required to effectuate a violation of Section 1512(b)(1).

The jury's verdict is also supported by much of the other testimony elicited at trial.  As Kroef and Weidlich both testified, Kroef met with Weidlich at Defendant's direction and on Morgan's accord to persuade Schunk to perpetuate the lies relayed on the scripts if questioned.  Kroef testified that, after the grand jury investigation began, Defendant asked him to find out what Schunk was "going to do about the investigation. A, were they under investigation?  B, what was their proceeding? What was their strategy."  (Tr. 33:19-21 (July 16, 2010 A.M.).) Defendant further requested that Kroef arrange a meeting with

Weidlich.  (Id. 39:5-7.)  Kroef held the meeting with Weidlich on November 30, 2000 to convey the "Morgan strategy" to "use joint venture discussions, acquisition discussions, all sort of legal possible activities to explain the meetings."  (Id. 37:23-25.) Kroef's discussion with Weidlich was not purely informational. Rather, as Weidlich testified:

> Mr. Kroef told me that . . . that the Morgan people had been interviewed by the United States authorities already.  And he told me that certainly at some given time the Schunk people will be interviewed as well.  And for that, he told me that they have made a kind of protocol after those interviews.  And he wanted me to -- to send me that -- that protocol, in order that I distribute it to the Schunk and Hoffman people, in order to make to -- in order to -- to make sure that the testimony that they would be giving would be the same as or similar to what the Morgan people have said.

(Tr. 9:6-18 (July 20, 2010 P.M.).)

After this meeting, Kroef informed Defendant that Weidlich was not "really grasping the importance of what was happening."  (Tr. 39:23-40:6 (July 16, 2010 A.M.).)  Thus, Defendant decided he needed to speak with Schunk's CEO, Dagobert Kotzur.  (Id.)  A follow-up meeting between Defendant, Weidlich, Kotzur and Kroef was held on February 26, 2001.[8]  As Weidlich testified, Defendant and Kroef urged the same conduct of Schunk at this second meeting:

---

[8]     Viewed in the light most favorable to the Antitrust Division, the evidence at trial also established that Defendant met with Kotzur on his own on December 17, 2000.  (See id. 46:3-47:1.)  Following this meeting, Defendant falsely represented on the dinner receipt that the meeting with Kotzur was arranged to discuss an acquisition.  (See Tr. 45:10-25 (July 20, 2010 A.M.).)

26

> [Defendant] strongly suggested that we make sure that our
> people answer in the same way, on the one hand because that
> would help to convince the US authorities that the Morgan
> story was right. And that could be an instrument in order to
> -- to slaughter Carbone. And on the other hand, he drew our
> attention to the fact that if the investigation into the
> carbon brush business cannot be stopped in the United States,
> then, for sure, an investigation in Europe will start as well.

(Tr. 20:16-23 (July 20, 2010 P.M.).) This evidence could lead a

rational jury to convict Defendant of Count Two.

So too could the testimony from two of the Antitrust

Division's witnesses regarding how Defendant and others sought

the retirement of Emerson, a British national residing in the

United Kingdom, who served as a pricing officer at Morgan. At

trial, evidence was presented that Emerson's retirement was

sought for the express purpose of preventing him from testifying

against Morgan in the proceedings after it became apparent that

any testimony Emerson might give could not be readily influenced.

Indeed, Macfarlane testified that, after learning of

the grand jury investigation, a concern arose that Emerson would

not be able to stick to the story in the scripts if questioned:

> [Defendant] emerged [from a meeting] saying that Mr. Emerson
> would not stand the questioning of his role in any of these
> activities going forward. . . .  [I]f he were questioned by
> the Department of Justice either in Canada or yourselves on
> his role, he would perhaps not be able to stay to the story.
> He would -- he would have to tell the truth.

(Tr. 43:12-16, 44:1-4 (July 20, 2010 A.M.).) Accordingly,

Emerson's retirement from Morgan was pursued. (See id. 44:7-9

("It was our view that as a retired employee, [Emerson] would be

inaccessible to either [sic] Department of Justice or Canada's Department of Justice").) Kroef also testified to this effect. (See Tr. 31:6-25 (July 16, 2010 A.M.) (explaining that "the company believed, at that time, if Mr. Emerson was no longer in the company, he could not be told to testify in a case against the company" and elaborating on how Defendant and others went about procuring Emerson's retirement).) This evidence supports the jury's verdict.

Accordingly, the Court concludes there was sufficient evidence for a rational jury to conclude that Defendant conspired to violate Section 1512(b)(1).

### ii. The Evidence Pertaining to Section 1512(b)(2)(B)

Because a rational jury could conclude that Defendant conspired with others to violate Section 1512(b)(1), it is technically unnecessary to consider whether the evidence at trial also supported a conspiracy conviction for the other object charged in the Indictment. See Griffin, 502 U.S. at 59-60. However, the evidence presented at trial provides a sufficient basis for a rational jury to have found Defendant guilty of a conspiracy to violate Section 1512(b)(2)(B) as well. Thus, in the interest of completeness, the Court will also discuss the arguments pertaining to Section 1512(b)(2)(B).

Section 1512(b)(2)(B) punishes those who "corruptly persuade[] another person . . . with intent to . . . cause or

28

induce any person to . . . alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding."  18 U.S.C. § 1512(b)(2)(B).  As discussed above in the context of Section 1512(b)(1), a nexus—albeit not necessarily the same nexus required under Section 1503—is required for a violation of Section 1512(b)(2)(B).  Thus, a defendant cannot be convicted under Section 1512(b)(2)(B) unless the document destruction occurs "in contemplation [of] any particular official proceeding in which those documents might be material."  Arthur Andersen, 544 U.S. at 708.  The indictment charged Defendant with conspiring to violate this statute by agreeing with others to:

> corruptly persuade and attempt to corruptly persuade other persons known to the Grand Jury with intent to cause or induce those other persons to alter, destroy, mutilate or conceal records and documents with the intent to impair their availability for use in an official proceeding; that is, a federal grand jury sitting in the Eastern District of Pennsylvania, conducting a price-fixing investigation of the carbon products industry . . . .

(Indictment ¶ 13.)

Defendant asserts the evidence at trial was insufficient to establish a conspiracy to violate Section 1512(b)(2)(B) because (1) there was no document destruction in the United States; (2) the documents destroyed were European documents only which were destroyed with no intent to affect the grand jury proceeding in the United States; (3) the document destruction occurred before the grand jury subpoena was issued;

and (4) the documents in Europe were, based on Defendant's understanding from legal counsel, beyond the power of the grand jury subpoena. These arguments lack merit.

First, this Court has already resolved the issue of whether a Section 1512(b)(2)(B) violation can lie where the document destruction occurred (1) outside of the United States; and (2) before the issuance of the grand jury subpoena. In Norris I, Defendant sought to dismiss Count IV of the indictment—the Count charging him with actually violating Section 1512(b)(2)(B)—on these same grounds. In rejecting these arguments, the Court explained:

> Defendant's contention that he could not have impaired the availability of foreign-based documents because they were beyond the grand jury subpoena power is irrelevant. The statute requires only that Defendant's action be taken "with intent to impair the object's integrity or availability for use in an official proceeding." The offense could have occurred even before the grand jury was empaneled and had authority to issue subpoenas. Here, the relevance of the Morganite subpoena (which also sought Morgan documents) is that it allegedly informed Defendant of the existence of the federal grand jury's price-fixing investigation. As explained earlier, it is for the jury to decide if Defendant and his co-conspirator's actions to destroy or conceal documents were taken with intent to impair their availability in the grand jury investigation.

2010 WL 2553620, at *6 (internal citations omitted); see 18 U.S.C. § 1512(h) (providing for "extraterritorial Federal jurisdiction over an offense under this section"); 18 U.S.C. § 1512(f) ("[A]n official proceeding need not be pending or about to be instituted at the time of the offense."). Thus, a rational

30

jury could have convicted Defendant even if the only document
destruction that took place occurred outside the United States
and before the grand jury subpoena was issued.

Second, the evidence supports a jury finding that
document destruction took place with the intent to affect the
grand jury proceeding in the United States. This evidence is not
negated by Defendant's understanding of what the grand jury could
legally compel. The grand jury subpoena was, as noted, served on
Morganite on April 27, 1999. (See GX-05.) This subpoena
requested production of "all responsive documents . . . of [the]
company without regard to the physical location of said
documents." (Id.) It clarified that it sought Morgan documents.
(See id. (instructing that the subpoena covered Morganite's
"divisions and affiliates").) Testimony was heard at trial that,
after receiving the subpoena, Defendant ordered the destruction
of responsive files. As Kroef testified:

> [I]f you're going to be subpoenaed in the United States -- so
> if you're under investigation on something very minor in the
> United States, that could be a serious risk of things coming
> to Europe.
>
> And of course, in Europe, we had an elaborate cartel
> system. So I recall a very, very short discussion with
> [Defendant] where he said, what was the last time you did a
> check on the -- on the files in the companies? And I said,
> ooh, that's been a long time. And he said, do you think it's
> wise to do another one? And I said, yeah, not a bad idea.
> That was triggered by the investigation here in the U.S.

(Tr. 28:5-16 (July 16, 2010 A.M.).)

Kroef further testified that, following this

31

conversation with Defendant, the document destruction was actually carried out:

> I selected three people [to review the files because] all three were involved in the cartel activities, because you didn't -- you wanted to keep the number of people involved as small as you possibly can . . . . [s]o they went to all our own offices in Europe, and did -- did the check. They just checked all the files . . . . Every time they found a copy of, let's say a quotation to a customer, which had some, let's say, indication of cartel activities handwritten on them, they would take them out of the file, and throw them away, destroy them.

(Id. 28:19-23, 29:3-18.) Emerson testified similarly. (See 17:1-19:25, 50:9-12 (July 14, 2010 A.M.) (Emerson's testimony that he was summoned by Kroef to destroy files in light of the subpoena and that files—including notes "relating to competitor meetings with the U.S. market"—were destroyed after the subpoena was served).)

Defendant takes exception to Kroef's testimony insofar as Kroef revealed on cross-examination that he could not recall the year in which Defendant instructed him to destroy the documents. However, Kroef did clearly testify that the conversation with Defendant occurred after the subpoena was served and was triggered by the same. This evidence thus supports a jury finding that Defendant and others agreed to destroy responsive documents for the purpose of preventing the grand jury from procuring them.[9]

---

[9]  Moreover, Defendant's contention that he did not understand the grand jury could obtain foreign documents is

Thus, a rational jury could find that Defendant conspired to violate Section 1512(b)(2)(B) by impairing the availability of documents for the grand jury proceeding.

### 3. Validity of the Charge for Which Defendant was Convicted

Finally, Defendant argues that the Court must enter a judgment of acquittal because the jury may have convicted him of the legally inadequate charge of "conspiracy to attempt" obstruction of justice.[10] It is true, as Defendant points out, that the verdict form provided to the jury allowed them to find Defendant guilty if he conspired to attempt to corruptly persuade other persons with intent to influence their testimony in violation of Section 1512(b)(1) or conspired to attempt to corruptly persuade other persons with intent to cause or induce them to destroy documents in violation of Section 1512(b)(2)(B). (See doc. no. 149.) It is also true that a general verdict

---

contradicted by Defendant's actions in ensuring the incriminating documents were destroyed after learning of the subpoena. A rational jury could conclude that the actions undertaken were designed to ensure the documents would be unavailable for the grand jury notwithstanding the legal advice Defendant may have received regarding the grand jury's ability to reach foreign documents.

[10] Defendant also asserts that the Court should not allow the charge to stand because there was no evidence presented at trial that Defendant conspired to attempt to violate either Section 1512(b)(1) or Section 1512(b)(2)(B). Even if this were true, however, the lack of evidence presented on these objects of the multiple-object conspiracy for which Defendant was convicted would not be a basis for setting aside the jury's guilty verdict. See Griffin, 502 U.S. at 59-60.

should be set aside where one of several bases for conviction is unconstitutional or illegal as opposed to supported by insufficient evidence.  See Griffin, 502 U.S. at 56, 59-60 (explaining that a general verdict should be set aside if one of the bases is unconstitutional or illegal, but holding a guilty verdict on a multiple-object conspiracy is valid even if there is insufficient evidence concerning one of the conspiracy's alleged objects).  However, the charge Defendant complains of is neither unconstitutional nor illegal.

Defendant cites a Fifth Circuit case from 1980, United States v. Meacham, 626 F.2d 503 (5th Cir. 1980), for the proposition that a conspiracy to attempt charge is illegal.  (See Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 55.)  In Meacham, the defendant was charged with conspiring to attempt a violation of two identical statutes which proscribed either attempt or conspiracy.  Id. at 506.  Noting that a successful conspiracy prosecution requires both a statute making the conspiracy a crime and a statute making the object of the conspiracy a crime, see id. at 507 ("In order successfully to prosecute a conspiracy, the government must be able to point to two separate provisions:  one making the act of conspiring a crime and one making the object of the conspiring a crime."), the Meacham Court concluded the indictment failed because the statutes at issue could only be read to permit a prosecution for

either conspiracy or attempt:

> The government seeks yeoman's performance out of [the statutes] by using them as conspiracy statutes and as substantive-offense statutes through which the conspiracy statutes can be applied.
>
> . . .
>
> Acceptance of the government's position would lead to the conclusion that [the statutes at issue] describe four separate crimes apiece: conspiracy, attempt, conspiracy to attempt and attempt to conspire. We do not believe Congress intended to create four discrete crimes with the three words "attempts or conspires."

Id. at 508 (internal footnote omitted). Thus, Meacham does not support Defendant's contention that a charge of conspiracy to attempt is illegal. The Meacham Court did criticize such a charge, see id. at 509 & n.7 (calling conspiracy to attempt "conceptually bizarre" and noting "it would be the height of absurdity to conspire to commit an attempt, an inchoate offense, and simultaneously conspire to fail at the effort"), but never had occasion to reach the issue. See id. at 509 ("Because we hold [the statutes] do not authorize conspiracy-to-attempt prosecutions, we need not reach the more elusive question . . . whether the government may prosecute the . . . crime of conspiracy to attempt in instances where separate provisions make both the conspiracy and the attempt criminal offenses.").

Instead, as the Meacham Court acknowledged, courts have permitted conspiracy to attempt prosecutions where defendants were prosecuted for conspiracy "in conjunction with other

35

statutes expressly making attempts criminal." <u>Id.</u> at 508. That
is precisely the situation in the instant case: Defendant was
indicted for conspiracy in violation of Section 371 to attempt
(or commit) violations of either Section 1512(b)(1), Section
1512(b)(2)(B) or both. And, notwithstanding the criticism lodged
by the Fifth Circuit in dicta three decades ago, such a charge is
hardly illegal. <u>See, e.g.</u>, <u>United States v. Clay</u>, 495 F.2d 700,
710 (7th Cir.) (rejecting argument that conspiracy to attempt
charge was legally invalid: "[w]hile entering the savings and
loan was obviously an objective of the conspiracy and a federal
crime, the men necessarily contemplated their attempting to gain
entry into the building, and such attempts are [also] expressly
proscribed"), <u>cert. denied</u>, 419 U.S. 937 (1974). Defendant cites
no cases that come close to establishing otherwise.

Therefore, because the jury convicted Defendant on a
legally adequate charge and could rationally conclude that
Defendant conspired to violate either Section 1512(b)(1) or
Section 1512(b)(2)(B), the Court will deny Defendant's motion for
a judgment of acquittal under Rule 29.

## IV. MOTION FOR A NEW TRIAL UNDER RULE 33

Rule 33 allows the Court to grant a new trial upon the
defendant's motion "if the interest of justice so requires."
Fed. R. Crim. P. 33. Defendant asks the Court to vacate the

jury's conviction and grant a new trial under Rule 33 for two reasons. First, Defendant claims the jury's guilty verdict is against the weight of the evidence. Second, Defendant argues that fundamental errors throughout the trial tainted the jury's verdict. These contentions are addressed in turn.

A.    Defendant's Argument that the Verdict is Against the Weight of the Evidence

1.    Legal Standard

Defendant first argues that the Court should order a new trial under Rule 33 because the jury's verdict was against the weight of the evidence. In evaluating whether a jury's verdict was against the weight of the evidence, the court does not view the evidence in the light most favorable to the government as it does when considering a motion for a judgment of acquittal under Rule 29. Instead, the court exercises its own judgment in evaluating the government's case. See United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). However, motions for a new trial based on the weight of the evidence "are not favored" and should "be granted sparingly and only in exceptional cases." United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003) (quoting Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)). Indeed, "even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that

an innocent person has been convicted.'" United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting Johnson, 302 F.3d at 150).

## 2. Discussion

The theme of Defendant's weight-of-the-evidence argument is that the seemingly damning evidence presented at trial is not actually incriminating but, when properly construed and analyzed, demonstrates Defendant's innocence. To that end, Defendant primarily advances four contentions: (1) that the scripts were not materially false because joint ventures were actually discussed at the meetings; (2) that the scripts were merely produced to marshal a legitimate legal defense; (3) that Emerson's retirement was legitimate and not the product of a scheme of obstruction; and (4) that some of the witnesses were not credible because they testified years later pursuant to corporate or personal plea agreements and selectively remembered details of past events.[11]

In so doing, Defendant advances a fanciful story of innocence, drawing the most innocuous interpretation of the multitude of facts presented to the jury over the course of the seven day trial. However, as the evidence outlined above in examining Defendant's Rule 29 challenge confirms, the facts of

---

[11]    Unsurprisingly, Defendant launches his credibility argument in explaining away the testimony that is unfavorable to his position.

this case hardly lead one to believe that "an innocent person has been convicted." <u>Id.</u> (internal marks omitted). Nevertheless, because the standard of review for a weight of the evidence challenge under Rule 33 differs from that conducted above in evaluating the facts for the purpose of considering Defendant's Rule 29 arguments, the analysis that follows briefly addresses, in turn, Defendant's professed bases of innocence.[12]

First, the evidence at trial readily demonstrates that the scripts were materially false. Several witnesses testified to this effect. (<u>See</u> Tr. 30: 16-20 (July 15, 2010 A.M.) (Perkins' testimony that the "headline approach to [the minutes produced] was that the meetings were primarily about joint ventures" and that this was not true); <u>id.</u> 111:17 (Muller's

---

[12]   It is axiomatic that the court views the facts in the light most favorable to the government in evaluating a defendant's motion for a judgment of acquittal under Rule 29. By contrast, the inquiry associated with a weight of the evidence challenge under Rule 33 is considerably different insofar as the court is required to exercise its own judgment in determining whether to grant the defendant relief. But because the court's ability to order a new trial based on a verdict against the weight of the evidence is extremely limited, the different standards of review do not materially change the analysis the Court has already undertaken in the Rule 29 context insofar as the Court is persuaded that (1) the government's witnesses and evidence were credible; and (2) ample evidence befitting a guilty verdict was presented. <u>See</u> <u>United States v. Hunt</u>, 526 F.3d 739, 744 n.1 (11th Cir. 2008) ("For the same reasons our de novo review of the evidence leads us to conclude the evidence was sufficient to convict Hunt, we find the district court did not abuse its discretion in declining to grant him a new trial."). Consequently, it is unnecessary to rehash at length the facts proven at trial.

testimony that the scripts were "a cover story"); Tr. 15:12-15
(July 14, 2010 P.M.) (Emerson's testimony regarding a
conversation between Perkins and Emerson in which both
acknowledged the minutes were "false").)

Defendant attempts to discredit the falsity of the
scripts by arguing that there were, in fact, discussions
pertaining to joint ventures at the meetings for which the
scripts were ultimately produced. Thus, according to Defendant,
the omission of price-fixing in the notes was not materially
false as to show Defendant's intent to obstruct justice. But, as
noted, several witnesses explicitly described the notes as false,
explaining that they were created for the express purpose of
misleading the grand jury investigation in one way or another.
Moreover, Defendant's handwritten notes from one of the alleged
joint venture meetings clearly show that price-fixing, at a
minimum, predominated. (See, e.g., GX-01.)

Second, the facts do not support the benign
interpretation of the scripts' creation Defendant advances.
Defendant, pointing to testimony that the scripts were to
"account for" and "justify" certain meetings, claims the evidence
shows that the scripts were a component of Morgan's efforts to
develop a legitimate legal defense. Defendant supports this
interpretation by noting that most of the summaries are labeled
"Attorney Privileged Information." Moreover, Defendant

rationalizes the above-described meetings with Schunk in November 2000 and February 2001 as "simpl[e] . . . attempt[s] to discover[] what strategy Schunk was employing with respect to the grand jury investigation." (Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 79.) Viewed as a whole, the evidence at trial does not support Defendant's contention.

As a legal matter, the fact that the scripts may have been produced at the behest of attorneys is—for the reasons discussed in evaluating Defendant's motion for a judgment of acquittal—irrelevant provided the purpose of the scripts' production was to influence grand jury testimony. And, factually, the evidence at trial strongly supports the conclusion that was precisely their purpose. Several witnesses testified that the scripts were developed to be a cover story for the parties who price-fixed. (See Tr. 31:21-23 (July 20, 2010 A.M.); id. 28:17-19; Tr. 109:1-10; 112:8-12 (July 15, 2010 P.M.).) Indeed, as Kroef explained it, the scripts were designed to form a "new memory" that was to be memorized "if you would be questioned" by anybody with respect to the investigation. (Tr. 12:23-13:3, 14:7-8 (July 16, 2010 A.M.).) And, as the accounts of the Schunk meetings confirm, others were persuaded in order to facilitate this goal. (See Tr. 9:6-18 (July 20, 2010 P.M.); id. 20:16-23.)

Third, the evidence concerning Emerson's retirement

does not support Defendant's claim of innocence. Defendant, citing United States v. Farrell, 126 F.3d 484 (3d Cir. 1997), contends that persuading Emerson to retire early was lawful. In Farrell, the Court held that corruptly persuading under Section 1512(b) "does not include a noncoercive attempt to persuade a coconspirator who enjoys a Fifth Amendment right not to disclose self-incriminating information." Id. at 488. According to Defendant, Emerson's retirement was within the lawful conduct defined in Farrell because Emerson was (at worst) merely advised not to voluntarily disclose information. Defendant claims that counsel's involvement in advising Emerson that he could not be forced to testify if he retired confirms this account.

However, the evidence at trial showed that the purpose of Emerson's retirement was not merely to advise or encourage him not to speak on a matter he had no legal duty to discuss with the government—it was to induce Emerson into not offering testimony that would incriminate Morgan. This activity, as Farrell acknowledges and Arthur Andersen confirms, is illegal under Section 1512(b). See Arthur Andersen, 544 U.S. at 706 (corrupt persuasion requires criminal culpability); Farrell, 126 F.3d at 488 ("[W]e are confident that . . . attempting to persuade someone to provide false information" would constitute "corrupt persuasion punishable under § 1512(b)" (internal marks omitted)).

In particular, testimony was heard at trial that

42

Emerson's retirement was sought when it became apparent Emerson might be unable to stick to the scripts when questioned. (Tr. 43:12-16, 44:1-4, 44:7-9 (July 20, 2010 A.M.).) At the time of his retirement, Emerson was making about £32,000 and would not have been able to retire on a full pension. (Tr. 24:18-21, 25:14 (July 14, 2010 P.M.).) Nevertheless, he requested and was granted a pension of £150,000 without any negotiation whatsoever. (Id. 25:8-22.) Thereafter, Emerson received a letter explaining that Keany, in connection with the internal investigation "should simply like to confirm with you, your role in the many meetings we held to exit our joint ventures with Le Carbone." (GX-07.) However, Emerson had no involvement in the Carbone joint venture. (Tr. 29:19-23 (July 14, 2010 P.M.).) Taken together, this evidence strongly indicates that Emerson's retirement was affirmatively designed to influence him not to offer incriminating testimony.

Finally, Defendant's attempts to discredit the witnesses who offered incriminating testimony are without foundation. Defendant, citing the fact that the government witnesses testified pursuant to plea agreements, intimates that the Antitrust Division improperly influenced the testimony of the witnesses.[13] For example, Defendant notes that "Kroef took every

---

[13]  As discussed _infra_, Defendant also suggested as much to the jury during his closing argument.

opportunity to quarrel and shade the evidence toward impropriety" and that the witnesses called by the Antitrust Division "dutifully provided conclusory testimony that the meeting summaries were false." (Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 88.) Defendant further questions the credibility of the witnesses, noting they selectively remembered certain details that were favorable to the Antitrust Division's theory of the case. However, the Court is persuaded that the witnesses were credible. In addition, the exhibits entered into evidence readily support the testimony advanced. Consequently, the Court concludes, for the purpose of its Rule 33 analysis, that Defendant has failed to show the witnesses were not credible.

Thus, because the evidence does not support Defendant's contention that his conviction was a miscarriage of justice, the Court will deny Defendant's motion for a new trial based on the weight of the evidence.

B. <u>Defendant's Argument that Fundamental Errors were Committed During Trial</u>

Defendant also contends that he should receive a new trial under Rule 33 because fundamental errors at trial—on their own and coupled with others—prejudiced his case. Specifically, Defendant claims that a new trial should be ordered based on: (1) errors in the jury instructions; (2) the Court's decision to allow Keany to testify; (3) the Antitrust Division's alleged

44

failure to comply with its discovery obligations under <u>Brady</u> and Rule 16 of the Federal Rules of Criminal Procedure; and (4) prosecutorial misconduct by the Antitrust Division in its closing argument and rebuttal.

1. <u>Legal Standard</u>

A court should only grant a motion for new trial based on errors at trial where the "error . . . had a substantial influence on the verdict." <u>United States v. Malik</u>, No. 08-614, 2009 WL 4641706, at *3 (E.D. Pa. Dec. 7, 2009) (internal marks omitted) (quoting <u>United States v. Eniqwe</u>, No. 92-257, 1992 WL 382325, at *4 (E.D. Pa. Dec. 9, 1992)). Where multiple errors are alleged, a new trial may be granted only where the errors, "'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" <u>United States v. Copple</u>, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quoting <u>United States v. Thornton</u>, 1 F.3d 149, 156 (3d Cir. 1993)). Consequently, harmless errors that do not deprive the defendant of a fair trial are not a basis for granting a defendant's Rule 33 motion. <u>See</u> <u>id.</u>

2. <u>Errors in the Jury Instructions</u>

Defendant contends that the Court committed several errors in instructing the jury which entitle him to a new trial. In evaluating alleged errors in jury instructions, the court is to "consider the totality of the instructions and not a

particular sentence or paragraph in isolation." <u>United States v.</u>
<u>Khorozian</u>, 333 F.3d 498, 508 (3d Cir. 2003) (quoting <u>United</u>
<u>States v. Coyle</u>, 63 F.3d 1239, 1245 (3d Cir. 1995)).  "Moreover,
in reviewing jury instructions, our task is also to view the
charge itself as part of the whole trial" since "isolated
statements . . . seemingly prejudicial on their face, are not so
when considered in the context of the entire record of the
trial."  <u>United States v. Park</u>, 421 U.S. 658, 674-75 (1975)
(internal marks omitted) (quoting <u>United States v. Birnbaum</u>, 373
F.2d 250, 257 (2d Cir. 1967)).  Two special considerations apply
to the court's review.  First, where the alleged error is that
the court failed to give a requested instruction, error only lies
"if the omitted instruction is correct, is not substantially
covered by other instructions, and is so important that its
omission prejudiced the defendant."  <u>United States v. Davis</u>, 183
F.3d 231, 250 (3d Cir. 1999).  Second, to the extent the
defendant failed to object at trial, the contested jury
instruction is reviewed for plain error only.  <u>See</u> <u>Virgin Islands</u>
<u>v. Knight</u>, 989 F.2d 619, 631 (3d Cir. 1993).  Under this
standard, the instruction at issue is only reversible if the
error is "particularly egregious" such that it "seriously
affect[s] the fairness, integrity or public reputation of
judicial proceedings."  <u>Id.</u> (quoting <u>United States v. Young</u>, 470
U.S. 1, 15 (1985)).

Here, Defendant argues the Court erred by (1) not identifying the overt acts Defendant committed in furtherance of the conspiracy; (2) constructively amending the indictment via its preliminary instruction; (3) failing to give an instruction on the right to withhold testimony; (4) giving an improper instruction as to the "nexus" required for a Section 1512(b) violation; (5) failing to distinguish between the charged conduct of "influencing" testimony and the uncharged conduct of "preventing" testimony; and (6) failing to give a missing witness instruction. Defendant failed to timely object to the first two alleged errors and they are therefore reviewed for plain error. The remaining objections were timely raised. Nevertheless, the third, fifth and sixth alleged errors cited by Defendant are only "error" in limited circumstances. See Davis, 183 F.3d at 250. As explained more fully below, the Court concludes that none of the supposed errors—individually or collectively—are grounds for granting Defendant's motion.

        i.    <u>Failure to Identify the Overt Acts Defendant</u>
              <u>Took in Furtherance of the Conspiracy</u>

Defendant objects to the Court's jury charge on overt acts. Because Defendant failed to timely raise this objection, this Court's review is for plain error. In its charge, the Court instructed the jury as follows:

> With regard to the fourth element of the conspiracy, that is the overt acts, the Government must prove beyond a reasonable doubt that during the existence of the conspiracy

at least one member of the conspiracy performed at least one of the overt acts alleged in the indictment for the purpose of furthering or helping to achieve the objectives of the conspiracy.

The indictment alleges certain overt acts. The Government does not have to prove that all of these acts were committed or that any of these acts were themselves illegal. Also, the Government does not have to prove that Ian Norris personally committed any of the overt acts.

The Government must prove beyond a reasonable doubt that at least one member of the conspiracy committed at least one of the overt acts charged in the indictment and committed it during the time that the conspiracy existed for the purpose of furthering or helping to achieve the objectives of the conspiracy. You must unanimously agree on the overt act that was committed.

(Tr. 36:9-37:2 (July 22, 2010 P.M.).) According to Defendant, this instruction was erroneous because it failed to identify the overt acts in the Indictment. The Court disagrees. The instruction was not, by any measure, plainly erroneous because any error actually benefitted Defendant.

Indeed, "[i]t is well settled that the government can prove overt acts not listed in the indictment, so long as there is no prejudice to the defendants thereby." United States v. Schurr, 794 F.2d 903, 908 n.4 (3d Cir. 1986). Thus, any speculation by the jury as to whether an overt act was or was not charged in the Indictment would, by definition, be harmless. Defendant acknowledges this point, but claims that only the acts alleged in the indictment could support a conviction where, as in this case, the court's instruction expressly directs the jury to consider the overt acts in the indictment. Some courts have

48

reached this conclusion.  In <u>United States v. Morales</u>, for example, the First Circuit held "the absence of any evidence with respect to . . . [the] alleged [overt] acts is grounds for reversal of [a] conspiracy conviction" where the instructions given by the court "refer[] repeatedly only to the specific overt acts alleged in the indictment."  677 F.2d 1, 2 (1st Cir. 1982) (citing <u>United States v. Negro</u>, 164 F.2d 168, 171-72 (2d Cir. 1947)), <u>overruled on other grounds</u>, <u>United States v. Bucuvalas</u>, 909 F.2d 593, 594 (1st Cir. 1990).

However, the Court did not "refer[] repeatedly only to the specific overt acts alleged in the indictment," <u>id.</u>; its description was decidedly general.  At least under these circumstances, the general rule that the government need not prove the overt acts in the indictment is not displaced under the law of this Circuit.  <u>See</u> <u>Schurr</u>, 794 F.2d at 907-08 (describing jury instruction requiring the jury to find "that an overt act that had been <u>listed in the indictment</u> took place within five years of the indictment" but nevertheless stating and applying the general rule that the government need not prove the overt acts alleged in the indictment (emphasis added)).  Accordingly, Defendant actually benefitted from the Court's instruction to the extent it suggested to the jury that a guilty verdict required a finding that Defendant committed one of the overt acts charged in the Indictment.  <u>See</u> <u>id.</u> at 908 n.4 (alleged error was harmless

49

to defendant and "if anything . . . hurt the government by limiting the overt acts upon which the jury could rely").

Thus, the Court's failure to recite the overt acts in the jury charge was not plain error and is not grounds for ordering a new trial.[14]

ii. Alleged Constructive Amendment of the Indictment via the Preliminary Instructions

Defendant also objects to another aspect of the Court's instructions which he failed to raise at trial—the Court's preliminary instructions which provided the jury with a cursory explanation of both parties' legal theories of the case. And, because Defendant failed to timely object to this instruction, it is reviewed for plain error. During this overview, the Court explained the case to the jury as follows:

> [P]lease remember that I do not know any facts of this case. I do not know the circumstances, and anything that I may say now is simply to help you place the case in context, not that I'm relating to you any facts of the case, but I'm going to give you the Government's theory of the case, and then I'm going to give you the defendant's contention so that you get a sense of what is going to be happening in the case.
>
> . . .

---

[14]     Defendant also contends the Court committed plain error by not defining the term "overt acts" for the jury. This argument is not persuasive. First, there is no good reason the term ought to be defined. Second, there was an abundance of evidence that Defendant and his co-conspirators committed overt acts in furtherance of the charged conspiracy. It could, therefore, hardly be said that the failure to define the term was manifestly unfair as to constitute plain error.

The indictment alleges that the obstruction of justice charges involved some of the following activities. The defendants and his co-conspirators provided false and fictitious relevant and material information in response to a Federal Grand Jury investigation into the carbon products industry.

The defendant and his alleged co-conspirators prepared what the Government calls a script, that is, some documents containing false material information which was to be followed by anyone questioned by either the Antitrust Division or the Federal Grand Jury. Defendant Norris and his alleged co-conspirators contacted other persons who had information relevant to the investigation being conducted by the Antitrust Division and the Federal Grand Jury and distributed the so-called script to them with instructions to follow the -- what the Antitrust Division calls the script when answering questions posed by either the Antitrust Division or the Federal Grand Jury.

. . .

Now, that's the Government's theory of the case. That's what the Government will contend. The defendant has pled not guilty to the indictment, and as we have indicated and charged you, he is entitled to the presumption of innocence.

The defendant contends that Mr. Norris is not guilty because he did not knowingly, corruptly persuade any witness who was going to appear before a U.S. Federal Grand Jury sitting in the Eastern District of Pennsylvania. The defense also contends that the meeting summaries at issue in this case were not prepared for the purpose of influencing any witness's testimony before the United States Federal Grand Jury. Rather, the defendant contends that the meeting summaries were prepared at the request of counsel to aid the counsel's fact gathering process in representing Mr. Norris and his company.

(Tr. 27:3-30:2 (July 13, 2010 A.M.) (emphasis added).) Defendant

argues the Court's reference to the Antitrust Division's theory

that Defendant was culpable for acts directed at "anyone

questioned by either the Antitrust Division or the Federal Grand

51

Jury" constructively amended the Indictment insofar as it permitted a guilty finding on the Section 1512(b)(1) conspiracy charge if the jury found Defendant had conspired to mislead the Antitrust Division but not the grand jury.

Under the facts of this case, the preliminary instructions were not plain error. For one, the Court clearly instructed the jury they were not to apply these instructions, which were a mere recitation of the parties' respective theories of the case. The Court's actual jury instructions—which the jury took with them to the deliberation room—instructed the jury that it could only find Defendant guilty if he conspired to influence testimony in the grand jury proceeding. (See Tr. 30:19-25 (July 22, 2010 P.M.).)

And, significantly, the final instructions the Court provided further informed the jury that the final instructions—and not the prior informational instructions—were the Court's explanation of the law to be applied. (See id. 13:10-12 ("We have now arrived at the point in the case where I charge you before you go out to deliberate. That is to say, this is the point where I tell you what the law is."). For this reason, the preliminary instructions could not have been prejudicial to Defendant in this case.[15] See United States v.

_____

[15] In any event, it is debatable whether the preliminary instructions mean what Defendant says they do. The statements made in the preliminary instructions do not state that Defendant

52

Hernandez, 176 F.3d 719, 735 & n.10 (3d Cir. 1999) (holding preliminary instructions may be a basis for dismissing a conviction, but clarifying that "[w]e only hold that when such preliminary instructions are given, jurors must not be allowed to guess at which of two conflicting instructions control their deliberations.  This can be avoided by simply informing jurors which instructions control in the event they perceive a conflict" (emphasis added)).

Consequently, the Court's preliminary instructions do not entitle Defendant to a new trial.

### iii. Failure to Give an Instruction on the Right to Withhold Testimony

Defendant next argues that the Court erred by not giving the following requested instruction on the right to withhold testimony:

> [I]t is not "corrupt persuasion" to persuade a co-conspirator to withhold, or fail to volunteer, information, no matter how important that information may be to the grand jury proceeding.  In other words, you may not find someone has "corruptly persuade[d]" another person if all he did was to persuade co-conspirators to withhold incriminating information.

(Doc. no. 59.)  Although Defendant timely requested this

---

and his co-conspirators asked others to lie only to either the grand jury or to the Antitrust Division.  Thus, one could read the statement to imply that a guilty finding would require Defendant to have lied to both the grand jury and the Antitrust Division.  Under such a reading, the jury would not believe it could find Defendant guilty without finding that Defendant's conduct was directed to the grand jury.

instruction, the Court opted not to give it and instead charged
the jury as follows:

> [T]o corruptly persuade, that means to corrupt another person
> by persuading him or her to violate a legal duty, to
> accomplish an unlawful end or an unlawful result or to
> accomplish some other lawful end or lawful result by an
> unlawful manner.  To persuade, that means to cause or induce
> a person to do something or not to do something.

(Tr. 39:13-19 (July 22, 2010 P.M.).)  The instructions employed

by the Court were derived from the Third Circuit pattern

instructions for obstruction of justice.  See Mod. Crim. Jury

Instr. 3d Cir. 6.18.1512B.  Defendant, although apparently

recognizing that the instructions given were legally accurate,

contends he was entitled to the requested instruction based on

United States v. Farrell, which, as discussed earlier, held that

corruptly persuading under the Section 1512(b) "does not include

a noncoercive attempt to persuade a coconspirator who enjoys a

Fifth Amendment right not to disclose self-incriminating

information."  126 F.3d at 488.

Defendant's argument can be easily rejected because it

is intimately tied to two of the factual misconceptions that

underscored his motion for a new trial based on a verdict against

the weight of the evidence.  Namely, that (1) the scripts were

not materially false; and (2) Emerson's retirement was not

illicit because he had no obligation to voluntarily disclose

information.  Accepting these facts as true, Defendant reasons

that both the omission of price-fixing from the meeting summaries

54

and the effort to facilitate Emerson's retirement could have been found by the jury to further an entirely lawful withholding of information. But, as explained in rejecting Defendant's weight of the evidence argument, the evidence at trial showed the scripts were materially false and that the circumstances attendant to Emerson's retirement were designed to influence his testimony or prevent it altogether. Thus, there was no lawful withholding of information in this case. In fact, to the extent there was any withholding of information, it was in the context of asking others to tell a story including affirmative lies which deliberately left out material information.

For these reasons, Defendant was not entitled to the requested instruction and it was no error not to give it.

### iv. Alleged Error in the "Nexus" Requirement Instruction

Raising many of the same arguments advanced elsewhere, Defendant claims the Court erred in its instruction on the nexus requirement with respect to Counts Three and Four of the Indictment.[16] The Court instructed the jury as follows on the nexus required for Count Three, which charged Defendant with violating Section 1512(b)(1):

The Government must prove beyond a reasonable doubt that

---

[16] Although the jury ultimately acquitted Defendant on these counts, it did find Defendant guilty of conspiring to violate the statutes they charged Defendant with actually violating.

Ian Norris's actions would have the natural and probable effect of interfering with the Grand Jury proceeding, that is, the acts must have a relationship in time, causation or logic with the Grand Jury proceeding.

If the defendant lacks knowledge that his actions are likely to affect the Grand Jury proceedings, he lacks the requisite intent to obstruct. However, the Government is not required to prove that at the time of the corrupt persuasion that [sic] the person who was the subject of the persuasion was under subpoena or scheduled to testify at the Grand Jury proceeding.

Testimony in the context of this case is evidence that a witness gives or may give under oath.

(Tr. 40:6-19 (July 22, 2010 P.M.).)  The nexus instruction as to Count Four, which charged Defendant with violating Section 1512(b)(2)(B), was substantially similar.  (See id. 43:4-6 ("[T]he Government is not required to prove that at the time of the corrupt persuasion the records or documents were under subpoena . . . .").)  According to Defendant, these instructions improperly informed the jury that (1) the existence of a subpoena was altogether irrelevant when, in fact, the absence of a subpoena can negate intent; and (2) Defendant could possess the requisite intent even if the individuals he targeted might not actually testify.  These objections were timely raised.

However, both of these arguments are founded in the same misconception this memorandum has already dispelled:  that Aquilar requires actual knowledge an individual will testify and would necessarily be governing with respect to the nexus required for a Section 1512(b) violation.  As explained earlier, the

56

standard of knowledge Defendant advances does not apply—at least not to a Section 1512(b) violation.  Viewed as a whole, then, the instruction was entirely proper as to the nexus required.  It explained to the jury that there must be a connection in time, causation or logic between the defendant's actions and the grand jury proceeding, but clarified that (1) a grand jury subpoena was not required for a violation; and (2) actual testimony from the witness was not required.  These clarifying points track the statutory language of Section 1512(f)(1), which plainly states "an official proceeding need not be pending or about to be instituted at the time of the offense."  18 U.S.C. § 1512(f)(1).

Thus, the nexus requirement instruction was not improper and is not grounds for a new trial.

   v. Failure to Distinguish in the Instructions Between "Influencing" and "Preventing"

Defendant next contends the Court erred by not instructing the jury on the distinction between "influencing" and "preventing" in Section 1512(b)(1) given that Defendant was only indicted for violating the statute (and conspiring to do the same) by influencing the testimony of another.  Defendant raised this issue in the charge conference, and asked the Court to instruct the jury as follows:

> "Influencing" the testimony of another person does not include conduct intended to prevent the person from testifying. Instead, "influencing" means causing them to materially change the substance of the testimony they will provide in a particular grand jury proceeding.

57

(Doc. no. 59.)  According to Defendant, the Court erred by not instructing on the distinction between the terms because the jury could confuse actions the Defendant may have taken to "prevent" testimony with those designed to "influence" testimony and improperly convict him on that basis.

The parties do not dispute the distinction between the two concepts, which has been recognized in cases construing similar statutes.  See, e.g., United States v. Dawlett, 787 F.2d 771, 773-74 (1st Cir. 1986) (distinguishing between "influencing" and "preventing" because "one who attempts to kill a witness does not intend to influence that person's testimony, but rather to eliminate it entirely"); see also United States v. Johnston, 472 F. Supp. 1102, 1106 (E.D. Pa. 1979) ("[A]n attempt to 'influence' an individual means an attempt to make him change his course of conduct, that is, the course of his voluntary actions, and not an attempt to destroy him as a voluntary actor.").  Instead, the dispute concerns whether there was evidence supporting a jury finding that Defendant sought to prevent another's testimony as to entitle Defendant to the instruction:  the Antitrust Division suggests "prevent" refers to physically incapacitating another and that there was no evidence to this effect, while Defendant contends non-violent means qualify as "preventing" testimony under the statute and that the evidence concerning Emerson's retirement supports the requested instruction.

Although the cases espousing the difference between "prevent" and "influence" both hold a defendant did not influence insofar as the witness in question was physically incapacitated, the Antitrust Division's limited interpretation of the statute is too narrow. Nevertheless, it is not the case that Defendant's actions in this case could merely be characterized as preventing testimony within the meaning of the statute. The evidence concerning Emerson is illustrative of this point.

At the outset, Defendant attempted to influence Emerson's testimony by getting him to tell the story laid out in the scripts. When it became apparent that Emerson would be unable or unwilling to do so, Defendant sought, literally speaking, to prevent Emerson from testifying against Morgan. However, by doing so, Defendant again sought to influence the testimony Emerson might give insofar as Emerson was an available witness with material information. Thus, Defendant's actions were designed to make Emerson voluntarily "change his course of conduct." Cf. Johnston, 472 F. Supp. at 1106. This is much different from instances where, as in Johnston and Dawlett, the witness was killed to prevent any such voluntary choice.

Because the evidence at trial concerning efforts to prevent testimony was coextensive with Defendant's efforts to influence any testimony given, the instruction Defendant requested would have only served to confuse the jury alongside

the proper instruction the Court gave.[17]  Accordingly, its

omission did not prejudice Defendant and does not entitle

Defendant to a new trial.  See Davis, 183 F.3d at 250.

> vi.  Failure to Give a Missing Witness Instruction

Finally, Defendant argues the Court erred by not giving

the missing witness instruction that Defendant requested as to

three witnesses the Antitrust Division did not call:  (1) Emilio

DiBernardo; (2) Michel Coniglio; and (3) Kotzur.  All three were

employees of Morgan's competitors during the time of the alleged

price-fixing and coverup.  Defendant argues the failure to give

the instruction constitutes reversible error because Defendant

was entitled to such an instruction and was deprived of due

process by the Court's refusal.  The Antitrust Division, on the

other hand, asserts Defendant was not entitled to any such

instruction because (1) Defendant did not show the witnesses were

available to the Antitrust Division but not the Defendant; and

(2) the testimony given by the witnesses would have been

cumulative.

A missing witness instruction is appropriate only where

the witness in question (1) is available to one party and not the

---

[17]     Additionally, Defendant's proposed instruction is
legally erroneous to the extent it implies the witness must (as
opposed to may) testify in the official proceedings at issue.  As
discussed at length earlier, the nexus requirement for a Section
1512(b) violation does not require the witness to actually
testify.

other; (2) is not called to testify on behalf of the party to whom the witness is available without an explanation for the failure to call the witness; (3) is not prejudiced against the party to whom the witness is available; and (4) would give relevant, non-cumulative testimony.  See United States v. Ariza-Ibarra, 651 F.2d 2, 15-16 (1st Cir. 1981); see also United States v. Vastola, 899 F.2d 211, 235 (3d Cir.) ("[A] missing witness instruction is not appropriate when the witness is available to both the defense and the prosecution."), vacated on other grounds, 497 U.S. 1001 (1990).  In explaining the standard for a missing witness instruction, some Third Circuit cases suggest there is an affirmative entitlement to a missing witness instruction if the elements for the instruction are met.  See, e.g., United States v. Drozdowski, 313 F.3d 819, 824 n.3 (3d Cir. 2002) (stating a "defendant is entitled to an absent witness instruction when the testimony of a witness can only be produced by the Government" and that the instruction "is to be given in a case where the government fails to produce evidence" (emphasis added)).  However, each party is the captain of their own case and "a party's failure to call a witness does not necessarily imply that the witness's testimony would have been unfavorable to that party."  United States v. Busic, 587 F.2d 577, 586 (3d Cir. 1978), rev'd on other grounds, 446 U.S. 398 (1980).  Thus, district courts should not, as Defendant urges, treat missing

witness instructions as a matter of right.

Defendant contends a missing witness instruction should have been given because the witnesses were foreign witnesses who the Antitrust Division, by virtue of plea agreements, had superior access to since the witnesses were beyond the Court's subpoena power. However, the evidence on this point confirms the Court's earlier finding that Defendant never made any effort to obtain the testimony of these witnesses. Thus, Defendant's contention that the witnesses were not available to Defendant is sheer speculation. And, notwithstanding the plea agreements, two of the three witnesses were not available to the Antitrust Division at all: (1) Coniglio could not be located prior to trial; and (2) DiBernardo refused to testify for the Antitrust Division and was no longer subject to prosecution under the plea agreement because the statute of limitations had run on any crime DiBernardo committed. Cf. United States v. Henries, 98 F. App'x 164, 166 (3d Cir. 2004) (holding the district court's finding that defendant had equal access to confidential government informant was not clearly erroneous).

While the Antitrust Division concedes Kotzur was available, there is no indication his testimony would not have been cumulative. Indeed, two other witnesses—Weidlich and Kroef—both testified concerning the meeting between Defendant, Weidlich, Kotzur and Kroef. The Antitrust Division represents

that they opted not to call Kotzur as a witness based on
difficulties in interpreting his German speech.  This, itself, in
the absence of evidence to the contrary, is a satisfactory reason
for failing to call Kotzur as a witness.  See Busic, 587 F.2d at
586.  Coupled with the fact that (1) there was ample other
testimony presented on the topic Kotzur would have testified; and
(2) Defendant never cited Kotzur as a witness of interest before
asking the Court for a missing witness instruction,[18] the Court
correctly concluded the jury should not have been given the
missing witness instruction Defendant sought.  Thus, the Court's
refusal to give the missing witness instruction is not grounds
for ordering a new trial.  See Davis, 183 F.3d at 250.

     3.   Attorney Testimony in Violation of Defendant's
           Attorney-Client Privilege

At trial, the Court permitted Keany to testify as a
witness for the Antitrust Division.  This decision followed a
July 6, 2010 evidentiary hearing in which the Court sought to
determine whether Keany's testimony would violate Defendant's
attorney-client privilege.  Defendant had vigorously argued that
Keany represented Defendant in his individual capacity while the

---

[18]    At oral argument on this motion, for the first time and
without any support or documentation, defense counsel claimed
that he had attempted to secure Kotzur as a witness.  Because
this argument was not previously advanced, it is waived.  In any
event, it strains credulity that such an important point, if
indeed true, would not have been raised by defense counsel at any
point prior to oral argument.

Antitrust Division claimed Keany represented only Morgan, which

had duly waived its attorney-client privilege.

On consideration of the testimony presented at the

evidentiary hearing and the parties' proposed findings of facts,

the Court concluded Defendant did not meet the burden of

establishing an attorney-client relationship under the

controlling law of this Circuit.  See United States v. Norris, --

- F. Supp. 2d ----, 2010 WL 2733123, at *7 (E.D. Pa. July 12,

2010) ("Norris II").  The legal standard, as the Court explained,

required a corporate officer invoking an attorney-client

relationship with corporate counsel to demonstrate the following

elements:

> First, they must show they approached [counsel] for the
> purpose of seeking legal advice.  Second, they must
> demonstrate that when they approached [counsel] they made it
> clear that they were seeking legal advice in their individual
> rather than in their representative capacities.  Third, they
> must demonstrate that [counsel] saw fit to communicate with
> them in their individual capacities, knowing that a possible
> conflict could arise.  Fourth, they must prove that their
> conversations with [counsel] were confidential.  And, fifth,
> they must show that the substance of their conversations with
> [counsel] did not concern matters within the company or the
> general affairs of the company.

Id. at *4 (quoting In re Bevill, Bresler & Schulman Asset Mgmt.

Corp., 805 F.2d 120, 124-25 (3d Cir. 1986)).  The Court concluded

Defendant, a former CEO of Morgan, did not meet this burden:

> Defendant has not satisfied [the Court] that he sought
> legal advice or representation from the Law Firm in general or
> from Keany specifically.

First, Norris did not approach the Law Firm or Keany for

legal representation.  The evidence showed that the Law Firm
was contacted by Morgan (an existing client of the Law Firm)
. . . .  At no time, did Norris ask the Law Firm or Keany
specifically to represent him personally during the grand jury
investigation.  The conversation between Peppers and Norris
where Norris asked Peppers whether Keany could "continue to
represent him," is not to the contrary.  That conversation
reportedly occurred in late September 2001, a month prior to
the termination of the Law Firm's representation of Morgan,
and long after the scripts had been produced by Morgan to the
grand jury.  <u>Bevill</u>, 805 F.2d at 123 (prongs #1 & 2); <u>see</u>
Findings of Fact ¶¶ 2-4; 22-24.

     Second,  at  no  time  did  Keany  think  that  he  was
representing Norris individually.  In fact, at some point
during Keany's representation of Morgan, he advised Norris
that he should retain separate counsel.  <u>Bevill</u>, 805 F.2d at
123 (prong #3); <u>see</u> Finding of Fact ¶ 24.

     Third, the conversations between Norris and Keany only
involved matters within Morgan or the business affairs of
Morgan.    At  the  hearing,  Norris  failed  to  adduce  any
conversation with Keany which was confidential or which dealt
with  Norris'  personal  liability  or  criminal  exposure  as
opposed to Morgan's.  <u>Bevill</u>, 805 F.2d at 123 (prongs #4 & 5);
<u>see</u> Finding of Fact ¶ 25.

<u>Id.</u> at *6 (internal footnote omitted).

     Raising many of the same arguments this Court has

already considered and rejected, Defendant continues to contend

that Keany jointly represented him as an individual and Morgan as

a corporation.  Consequently, Defendant argues Keany's testimony

violated his attorney-client privilege and that he is therefore

entitled to a new trial.  Defendant also contends he is entitled

to a new trial because Keany improperly testified about European

price-fixing activity in the following manner:

     Q:          Mr. Keany, in representing Morgan in the -- in
                 the Grand Jury's investigation . . . would it
                 have been of interest to you to know whether

> Morgan was engaged in [price-fixing] in Europe?

A:     Yes, of course.

Q:     Did you ask Mr. Norris whether Morgan was engaged in any of that kind of conduct in Europe?

A:     I did.

Q:     And what did he tell you?

A:     He -- he told me that Morgan was not, but I remember he had a particular way of expressing it. He said -- about Europe, he said, could I put my hand on my heart and swear that nobody had fixed prices in Europe? I don't think I could do that, but Morgan didn't. He was very clear about that.

(Tr. 82:8-21 (July 19, 2010 A.M.).) According to Defendant, this "hand over heart" testimony was (1) a violation of the Court's ruling permitting Keany's testimony at trial; (2) prior bad act evidence under Rule 404(b) of the Federal Rules of Evidence for which Defendant was not provided the required pretrial notice; and (3) substantially more prejudicial than probative as to violate Rule 403 of the Federal Rules of Evidence. These arguments are unpersuasive.

First, the Court has already ruled that Keany's testimony did not violate Defendant's attorney-client privilege and denied a motion for reconsideration of this issue. And, in so doing, the Court explicitly recognized and permitted the testimony Defendant now takes issue with. (See id. 49:5-53:2 (considering that Keany would testify as to Defendant's

statements concerning European price-fixing, but nevertheless denying Defendant's motion for reconsideration of the Court's ruling that Keany's testimony would not violate Defendant's attorney-client privilege).) In fact, in <u>Norris</u> II, the Court expressly recognized that Keany's testimony might recount such conversations to the extent that they related to the Antitrust Division's proffer concerning (1) Morgan's internal investigation; (2) interactions between counsel with the Antitrust Division; and (3) the ultimate production of the scripts to the Antitrust Division. <u>See</u> <u>Norris</u> II, 2010 WL 2733123, at *7 (explaining that, amongst other things, Keany's testimony would include that, "when Keany interviewed Norris and his subordinates in connection with the internal investigation, they all told him the same story they had agreed to tell about their price-fixing meetings"). Thus, both of the Court's rulings on this issue did not bar mention of Defendant's statements to Keany as they related to the European price-fixing scheme.

Second, Defendant failed to timely object to Keany's "hand over heart" testimony under Rules 403 or 404(b) of the Federal Rules of Evidence.[19] <u>See</u> Fed. R. Evid. 103(a)(1) ("Error

_____

[19] In asserting the testimony at issue should not be presented to the jury during argument of Defendant's motion for reconsideration, Defendant never referred to Rule 403 or Rule 404(b). Instead, he only objected to the proffered testimony on attorney-client privilege grounds. (<u>See, e.g.</u>, Tr. 49:1-3 (July 19, 2010 A.M.) ("Well, if there was such a communication between Mr. Norris and Mr. Keany, that's the heart of the attorney/client

may not be predicated upon a ruling which admits . . . evidence"
unless a "a timely objection . . . stating the specific ground of
objection" is made).  This is particularly notable given that
Defendant had at least two opportunities to timely present his
objections:  (1) during the Court's consideration of Defendant's
motion for reconsideration when the Antitrust Division explained
that Keany would testify regarding Defendant's statements
relating to European price-fixing; and (2) when Keany actually

---

privilege.").)  It was not clear from the context in which
Defendant objected that his objection was predicated on Rule 403
or Rule 404(b).  Cf. Fed. R. Evid. 103(a)(1).

Moreover, the fact that Defendant raised certain
objections under Rules 403 and 404(b) in his proposed findings of
fact and conclusions of law did not preserve the instant
objections.  Those earlier objections were based on Keany's
proposed testimony that Defendant authorized him to transmit the
scripts to the Antitrust Division.  Defendant argued this
testimony was improper under Rule 404(b) because it provoked a
propensity inference—namely, that Defendant likely persuaded
persons to lie before the grand jury because he had allowed Keany
to transmit the false scripts to the Antitrust Division.  For
essentially the same reason, Defendant argued this testimony was
substantially more prejudicial than probative under Rule 403.

Thus, Defendant never presented to the Court any
argument remotely similar to the one advanced here:  that
testimony regarding Defendant's lie to Keany concerning European
price-fixing involvement was improper.  And because the Court had
no occasion to make a definitive ruling admitting this evidence,
see Fed. R. Evid. 103(a) ("Once the court makes a definitive
ruling on the record admitting or excluding evidence . . . a
party need not renew an objection . . . ."), Defendant had an
obligation to bring this objection to the Court's attention in
order to preserve it.  See United States v. Schalk, 515 F.3d 768,
776 (7th Cir. 2008) ("If no objection was made that would put the
district court . . . on notice of the objecting party's concern,
then the standard of review is for plain error." (emphasis
added)).

offered the supposedly offensive testimony.  Consequently, the
Court reviews Defendant's tardy objections for plain error.  <u>See</u>
Fed. R. Evid. 103(d).  Under this standard, Defendant's argument
fails.

Indeed, even assuming <u>arguendo</u> the testimony was not
intrinsic to the charges for which Defendant was tried as
evidence of a scheme to obstruct justice, it would nevertheless
be admissible under Rule 404(b) as it plainly bears on
Defendant's motive and intent to commit those offenses.  The fact
that Defendant lied about European price-fixing to Keany, the
corporation's attorney, in the midst of an internal investigation
relating to the very same conduct speaks to Defendant's motive
and intent to obstruct justice (and conspire to do the same) in
the United States.  Given this, it could hardly be said that the
testimony's "probative value [was] <u>substantially</u> outweighed by
the danger of unfair prejudice."  Fed. R. Evid. 403 (emphasis
added).

Finally, although Defendant's argument that the
pretrial notice required by Rule 404(b) was not given is
factually suspect based on the abovementioned proffer by the
Antitrust Division, it is clear—in any event—that Defendant's
substantial rights were not impacted by any delay.  Defendant was
apprised of the testimony well before it was presented to the

jury and had ample opportunity to prevent its admittance.[20] See
United States v. Gonzalez, 501 F.3d 630, 640 (6th Cir. 2007)
(holding that no plain error was committed where defense counsel
was given notice one day before trial; the fact defense counsel
stated he "considered filing a motion in limine" after receiving
the late notice demonstrated that the evidence's "admittance at
trial did not seriously affect the fairness, integrity, or public
reputation of the proceedings").

Thus, Keany's testimony—including his "hand over heart"
testimony—does not entitle Defendant to a new trial.

### 4.   Failure to Comply with Discovery Obligations

Defendant contends he is entitled to a new trial
because the Antitrust Division failed to comply with its
discovery obligations by:  (1) not producing material in
possession of Morgan, Schunk, and Carbone with whom the Antitrust
Division has cooperation agreements; (2) denying Defendant access
to foreign-located witnesses; and (3) redacting information in
witness notes turned over to Defendant that might have been
helpful to Defendant for impeachment purposes.  In denying a
series of motions to compel filed by Defendant on May 23, 2010,
the Court rejected most of the arguments now advanced in the

---

[20]    Pretrial notice under Rule 404(b) would, of course, be
unnecessary if the testimony presented by Keany was intrinsic to
the charges.  See, e.g., United States v. Watkins, 591 F.3d 780,
786 (5th Cir. 2009) ("If evidence is intrinsic, it simply does
not implicate the requirements of Rule 404(b).").

instant motion.  (See doc. no. 88.)  Then, as now, Defendant's arguments lack merit.

i.  <u>Legal Standard</u>

As a preliminary matter, it is necessary to distinguish between the discovery permitted under Rule 16 of the Federal Rules of Criminal Procedure and that required by due process under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and its progeny. Rule 16 contemplates a fundamentally limited range of pretrial discovery.  <u>See</u> <u>United States v. Ramos</u>, 27 F.3d 65, 68 (3d Cir. 1994) ("In contrast to the wide-ranging discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases.").  A Rule 16 violation does not automatically entitle a Defendant to a new trial.  Rather, the "extreme remedy of a new trial" is only warranted where the "government's failure resulted in a denial of [the defendant's] right to a fair trial."  <u>United States v. Lopez</u>, 271 F.3d 472, 484 (3d Cir. 2001).

"In addition to the government's discovery obligations under Rule 16(a), the government must also honor the defendant's constitutional rights, particularly the due process right <u>Brady v. Maryland</u> established."  <u>United States v. Jordan</u>, 316 F.3d 1216, 1251 (11th Cir. 2003).  Under <u>Brady</u> and its progeny, the government must—consistent with due process—turn over material

exculpatory evidence to the defense.  See United States v.
Reyeros, 537 F.3d 270, 281 (3d Cir. 2008) ("A Brady violation has
three components:  the evidence at issue must be favorable to the
defendant; it must be material; and it must have been suppressed
by the prosecution.").  However, evidence is material as to
require a new trial only where "there is a reasonable probability
that, had the evidence been disclosed to the defense, the result
of the proceeding would have been different."  Pennsylvania v.
Ritchie, 480 U.S. 39, 57 (1987) (quoting United States v. Bagley,
473 U.S. 667, 682 (1985)).

ii.  Discussion

Defendant's primary contention is that the Antitrust
Division violated Rule 16 and Brady by failing to turn over
materials in the possession of three of the foreign corporations
with whom the Antitrust Division had plea agreements with:
Morgan, Schunk and Carbone.  Where, as here, document production
is sought, the government must permit discovery of items "within
the government's possession, custody, or control."  Fed. R. Crim.
P. 16(a)(1)(E).  The government's Brady obligations extend
similarly:  the government must turn over materials it does not
possess that are in its "constructive possession"—i.e., possessed
by others acting "on the government's 'behalf'" or "under its
'control.'"  Reyeros, 537 F.3d at 282.  According to Defendant,
the Antitrust Division violated Rule 16 and Brady by not turning

over materials held by the three companies because the Antitrust Division had "broad power to obtain overseas documents" from the three companies since they "elected to enter into corporate amnesty and plea agreements." (Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 152.) Some courts have accepted similar arguments. See, e.g., United States v. Stein, 488 F. Supp. 2d 350, 364 (S.D.N.Y. 2007) (holding that materials in corporation's files are within government's "control" for Rule 16 purposes because of cooperation agreement).

However, as the Court explained in its July 24, 2010 order, the case-by-case test from United States v. Reyeros is controlling on the question of whether the government must produce materials possessed by another entity. In Reyeros, the Court analyzed this question in the context of determining whether the government had discovery obligations under Brady for materials in possession of another sovereign. The Reyeros Court explained that the following factors are relevant to this analysis:

> (1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence.

Reyeros, 537 F.3d at 282 (quoting United States v. Risha, 445 F.3d 298, 304 (3d Cir. 2006)). Although the precise context in which Reyeros tackled the constructive possession question

differs from that presented in the instant case, the circumstances are not materially different. In fact, the mode of analysis in <u>Reyeros</u> is even more compelling here, where the materials at issue are in the possession of non-governmental cooperating foreign entities.[21] Under this test, Defendant cannot show the Antitrust Division had the requisite control of any of the materials possessed by Morgan, Schunk, and Carbone as to have discovery obligations attendant to those materials.

While the companies entered into cooperation agreements with the Antitrust Division, they were not—by any means—agents of the Antitrust Division. And, contrary to Defendant's contention, the fact that the Antitrust Division could have possibly obtained the materials does not give rise to any discovery obligations.

---

[21] The test in <u>Reyeros</u> speaks only to the government's constructive possession of materials for <u>Brady</u> purposes. Given that Rule 16 limits document production discovery to materials within the government's "possession, custody, or control" and that <u>Brady</u> is rooted in constitutional due process, a strong argument can be made that Rule 16 does not (or should not) require as expansive disclosure of materials not in the actual possession of the government. <u>Cf.</u> <u>United States v. Gatto</u>, 763 F.2d 1040, 1048 (9th Cir. 1985) (concluding document production portion of Rule 16 does not have any "constructive possession extension" and that it therefore "triggers the government's disclosure obligation only with respect to documents within the federal government's actual possession, custody, or control").

However, while a different standard may apply for determining "custody" or "control" under Rule 16, it is unnecessary to reach this issue because Defendant has not shown how the alleged Rule 16 failings differ from those under <u>Brady</u> which, as noted <u>infra</u>, the Court concludes do not entitle Defendant to a new trial.

See <u>Reyeros</u>, 537 F.3d at 284 ("[T]he mere fact that documents may be obtainable is insufficient to establish constructive possession."). Instead, there must be a "showing that evidence is possessed by people engaged in the investigation or prosecution of the case." <u>Id.</u> Because the materials were in possession of non-governmental entities that were in no way working with the Antitrust Division or acting on its behalf, the Antitrust Division had no constructive possession of the materials and, correspondingly, no discovery obligations that would entitle Defendant to a new trial.[22] Nor do Defendant's additional arguments that the Antitrust Division improperly denied Defendant access to foreign witnesses and improperly suppressed impeachment material by making redactions to the documents the Antitrust Division produced.[23]

---

[22] Although the Court therefore need not consider whether the evidence at issue was "material" as to constitute a <u>Brady</u> violation, Defendant's materiality argument is suspect. Defendant asserts the Morgan Board minutes, which Defendant ultimately received pursuant to a Rule 17(c) subpoena after the Antitrust Division rested, demonstrate a <u>Brady</u> violation because they showed that the Morgan Board had entered into the plea agreement for "political reasons." Assuming <u>arguendo</u> the Antitrust Division did have an obligation to turn over these materials, this evidence does not support Defendant's conclusory determination that the Morgan Board minutes create a reasonable probability of a different result.

[23] Defendant's argument concerning foreign witnesses is largely the same as the one Defendant makes concerning his alleged entitlement to a missing witness instruction. In essence, Defendant contends that the Antitrust Division should have facilitated the witness' testimony in Defendant's trial because they had better access to the witnesses than the defense.

Thus, the alleged discovery violations do not entitle Defendant to a new trial.

5. Prosecutorial Misconduct in the Antitrust Division's Closing Argument and Rebuttal

Finally, Defendant contends he is entitled to a new trial based on statements made by the Antitrust Division during the closing argument and rebuttal. Specifically, Defendant asserts the Antitrust Division impermissibly: (1) referred to several facts outside the record; and (2) turned the jury's verdict into a referendum on the prosecutor's integrity. Defendant, having failed to timely object at trial, raises these issues for the first time in the instant motion. Accordingly, the alleged prosecutorial misconduct is reviewed for plain error.

---

However, because the facts demonstrate that Defendant was not denied access to foreign witnesses and because Defendant cannot demonstrate the requisite materiality under Brady, Defendant's argument fails. This is so even though the Antitrust Division redacted personal information from the witness list. Indeed, these redactions did not—as the Court has already held—prejudice Defendant's case. (See doc. no. 88 n.4 ("Defendant does not indicate how the redaction of personal information has actually impeded his access to witnesses in preparation of his defense").)

For similar reasons, Defendant's argument that the Antitrust Division violated Brady by redacting notes of interviews produced during discovery is equally meritless. In rejecting this argument initially, the Court pointed to Defendant's speculation of material evidence under Brady: "Defendant proffers mere speculation that the Government has exculpatory evidence and these speculations are insufficient to compel disclosure." (Doc. no. 88 n.4.) Defendant has still failed to show (or even mention) how the absence of redactions would have led to a reasonable probability of a different outcome.

See United States v. Rose, 538 F.3d 175, 177 n.3 (3d Cir. 2008)

("As to prosecutorial misconduct, because [the defendant] did not

object before the District Court, we review for plain error . . .

."). To satisfy this standard, "the review [of the record] must

reveal 'egregious error or a manifest miscarriage of justice.'"

United States v. Brennan, 326 F.3d 176, 182 (3d Cir. 2003). In

undertaking this analysis, the court is cognizant that

"[i]mproper conduct only becomes constitutional error when the

impact of the misconduct is to distract the trier of fact and

thus raise doubts as to the fairness of the trial." Marshall v.

Hendricks, 307 F.3d 36, 67 (3d Cir. 2002).

      i.   Reference to Facts Outside the Record

     Defendant first asserts that the Antitrust Division

impermissibly made reference to facts outside the record. In

particular, Defendant claims the closing argument was improper

because it: (1) invited speculation as to grand jury proceedings

for which there was no trial evidence; (2) stated that Defendant

lied to David Coker when there was no evidence to that effect;

(3) referred to Defendant's "big executive office" when there was

no evidence of any such office; and (4) invoked the Enron scandal

by referring to Emerson as "the smartest guy in the room"—a term

that, according to Defendant, must have referred to "the best-

selling account of the Enron scandal" titled "The Smartest Guys

in the Room: The Amazing Rise and Scandalous Fall of Enron."

(Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 172-73.)

Underlying Defendant's first three arguments is a narrow conception of what the prosecutor may do during closing argument. The last argument concerning the supposed allusion to Enron is unfounded speculation that requires no additional discussion.[24] Indeed, the prosecutor's first two statements concerning the grand jury and Coker were permissible as reasonable inferences that the jury could draw from the evidence presented. See United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994) ("[T]he prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." (quoting United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991))); see also Oliver v. Zimmerman, 720 F.2d 766, 770 (3d Cir. 1983) ("It is not prosecutorial misconduct to ask the jury to draw permissible inferences from anything that appears in the record . . . .").

Defense counsel, apparently believing that a Section 1512(b) violation should be inherently suspect where there was no testimony presented to a grand jury, repeatedly questioned witnesses on cross-examination whether they had received a

---

[24]    Even if the Court were to credit as true Defendant's suggestion that the prosecutor must have been invoking the Enron scandal by using the popular term "the smartest guy in the room," the facts of this case do not bespeak a manifest miscarriage of justice as to satisfy the plain error standard.

subpoena to testify before the grand jury. Given this evidence, the prosecutor could reasonably ask the jury to infer why no one had been subpoenaed—namely, because the scheme for which Defendant was prosecuted was successful. Cf. United States v. Glover, 558 F.3d 71, 79 (1st Cir. 2009) (prosecutor's question in closing, asking the jury "what other explanation can there be?" was proper; it was merely "appealing to the jurors' common sense in asking them to credit the government's explanation instead of the defendant's"). Similarly, there was ample evidence to support the inference that Defendant lied to Coker.[25]

And the prosecutor's third statement of a "big executive office" was a mere rhetorical device prosecutors may employ in summation after explaining they are stating "a matter of opinion not of evidence." Donnelly v. DeChristoforo, 416 U.S. 637, 646 (1974). Here, before making the reference Defendant complains of, the prosecutor clearly explained she was "just set[tting] the stage for [the jury], first, before we get started." (Tr. 19:19-20 (July 22, 2010 A.M.).) Consequently, the prosecutor's third statement was no error at all, let alone plain error. Cf. Albela v. Martin, 380 F.3d 915, 930 (6th Cir.

---

[25] It is unnecessary to delve into the facts supporting this inference, however, because this isolated misstatement of the evidence would not, in any event, be grounds for granting Defendant's motion for a new trial. The evidence of Defendant's guilt is substantial and there was evidence introduced of similar lies being told by Defendant to others, such as Keany, in furtherance of the scheme.

2004) (no reversible error where prosecutor presented hypothetical conversation to the jury because the prosecutor prefaced the conversation by explaining he was presenting his own beliefs).

Thus, the prosecutor's alleged references to facts outside the record are not grounds for setting aside Defendant's conviction and ordering a new trial.

ii. Turning the Verdict into a Referendum on the Prosecutor's Work on the Case

Defendant next contends he was prejudiced by the prosecutor's statements on rebuttal which "expressly equated a verdict of guilt or innocence of [Defendant] with a rejection or endorsement of the integrity of the prosecutor's work on the case." (Def.'s Mot. for Acquittal or, in the Alternative, a New Trial, at 173.) However, the prosecutor's statements on rebuttal were precipitated by defense counsel's closing argument and therefore served as a response to defense counsel that is best understood in the context of what occurred at trial.

Indeed, during Defendant's closing argument, the defense repeatedly attacked the Antitrust Division's case in an inflammatory manner. (See Tr. 69:17-29 (July 22, 2010 A.M.) (stating the prosecution's theory of the case that there was a "nefarious intent to all of this is made up. It's concocted, it's phony, and it melted away in the heat of this trial"); id. 83:1-3 ("Again, the suggestion that we're hearing from the

prosecutors in this case, is whenever there's something that isn't obvious, they take a nefarious read on it.").) Some of these attacks were plainly personal, suggesting that the Antitrust Division's case was brought due to the ambition of the prosecutors. (See id. 86:18-21 ("The only relevance to the fact that [Defendant] was the CEO and had a CEO's office, is that that made him a target for ambitious prosecutors."); id. 100:12-14 ("There were a lot of witnesses, who appeared in this case, who lack character, who lack the backbone to stand up to Government Prosecutors, who want to try and win a case.").) In fact, defense counsel accused the Antitrust Division of tampering with witnesses, explaining to the jury that Defendant's sole witness, Cox, bravely stuck to his story after the Antitrust Division employed a tactic that allegedly manipulated another witness, Muller, to acknowledge the meetings in question were price-fixing meetings after initially denying the same:

> And [Muller] goes to meet with the Government lawyers, and he's interviewed, and he said, yeah, I went to that Toronto meeting, and it was to deal with joint venture issues . . . .

> And then the Antitrust Division lawyers stand up and storm out with an implied, if not expressed threat, that if that account stays, then Mr. Muller will face the same type of prosecution that Mr. Norris has been going through.

> So what happens? Mr. Muller suddenly has a change of heart, a dramatic change of account, and says, you know what? That meeting dealt -- it didn't deal with joint ventures at all. It was a price-fixing meeting.

> . . .

So Mr. Cox goes in for an interview, he provides his account about the Toronto meeting, the same meeting that Mr. Muller attended and what does the -- what does the Antitrust Division attorneys do?  They stand up and storm out the same way the [sic] had with Mr. Muller.  It worked that time. Maybe it will work again with Mr. Cox.  It didn't work.  Mr. Cox had the backbone to stand up to the Antitrust Division and stick with the truth.

Ladies and gentlemen, this case is about witness tampering, but I -- I ask you, <u>who's doing the tampering in this case</u>?  Mr. Cox showed character when he was subjected to the heat that a crucible generates.  Mr. Muller fell apart.

(<u>Id.</u> 57:18-59:5 (emphasis added).)[26]

After the Defendant's closing and before rebuttal, the Antitrust Division asked for and received a side bar conference in which the Court and defense counsel were advised that the prosecutor considered defense counsel's statements a personal attack to which she would respond on rebuttal.  (<u>See</u> Tr. 3:11-15 (July 22, 2010 P.M.) ("I want to respond to it . . . . I cleared it with my supervisors.  I let them know what I was going to say. And I'm telling Your Honor that I'm going to respond.  I can't let it go.  It's a personal attack.").)  The Court asked defense counsel for his response.  No objection was lodged.  (<u>See</u> <u>id.</u> 3:22-24.)  Thus, the prosecutor conveyed the following to the jury at the conclusion of her rebuttal:

---

[26]    If defense counsel had evidence pretrial that the Antitrust Division tampered with witnesses, it should have moved to dismiss the indictment for prosecutorial misconduct.  <u>See</u> <u>United States v. Nolan-Cooper</u>, 155 F.3d 221, 229 (3d Cir. 1998) (outlining standard for dismissal of indictment based on outrageous government conduct).

And finally, ladies and gentlemen, you heard Mr. Curran say, both in his opening and in this closing, that the only people who were influencing witnesses here, the only influencing of witnesses that was done, was done by the Government attorneys, by Mr. Rosenberg and myself. And that's an incredibly serious charge to level against career prosecutors.

That we were here for one week, trying this case, doing our job, defending the laws of this country, against those who would ignore them and hold them in such low regard. Willing to put the Government's evidence in your hands, the hands of the jury, the guardians of our criminal justice system, so you could decide the fate of Mr. Norris. To personally and viciously disparage us by saying that we did all
that because of an over -- not because of the overwhelming evidence that we had, or the powerful evidence that we had, but because of some malicious unspecified motive that we harbor to influence the testimony of the Government witnesses.

Ladies and gentleman, over the past week, you saw and heard the witnesses. You've seen the evidence. It's up to you to judge their credibility and decide whether you believe them or not. It's up to you to weigh the evidence, and it's up to you, not Mr. Rosenberg, not me, but you, to convict or acquit Mr. Norris.

You've watched Mr. Rosenberg and me over this past week. And you also had an opportunity to watch Mr. Curran and Mr. Gidley and their team of lawyers. You decide the legitimacy of that Defense. I submit, ladies and Gentlemen, that smacks of desperation.

I submit, ladies and gentlemen, that those personal attacks on Mr. Rosenberg and myself are evidence of a desperate, desperate Defense. Evidence that we've not only done our jobs, but we've done our jobs well.

And at the end of the day, ladies and gentlemen, before we leave this trial, it's you, whether or not Mr. Norris is convicted or acquitted, it's up to you; not Mr. Rosenberg or not myself. You have the last word on Mr. Norris's guilt or innocence. You have the last one word; guilty. Thank you.

(Tr. 11:12-12:25 (July 22, 2010 P.M.).)  Defendant did not object

at any point during or after the Antitrust Division's rebuttal. Now, however, Defendant claims the prosecutor's rebuttal statements entitle him to a new trial, pointing to <u>United States v. Gracia</u>, 522 F.3d 597 (5th Cir. 2008) where the Fifth Circuit held the prosecutor's bolstering of witness testimony was plain error. The Court disagrees because this case is different from <u>Gracia</u> and cases like it.

Indeed, unlike <u>Gracia</u>, the prosecutor's rebuttal in this case did not vouch for the witness' credibility or ask the jury to believe the witnesses simply because the prosecutors were doing their job. <u>Cf. id.</u> at 600 (holding prosecutor's statements were plain error where prosecutor told the jury that an acquittal of defendant would mean that they believed the agents "got out of bed" on the day they arrested the defendant and decided this was "the day that [they] were going to start [a] conspiracy to wrongfully convict [the defendant]"). Instead, and in sharp contrast, the prosecutor's rebuttal was a measured response to a personal attack lodged by defense counsel. Such responses are appropriate and not grounds for setting aside a defendant's conviction. <u>See</u> <u>United States v. Young</u>, 470 U.S. 1, 12-13 (1985) (explaining that, "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction"); <u>see also</u> <u>United States v. Torres</u>, 809 F.2d 429, 437 (7th Cir.

1987) ("In light of defense counsels' arguments that the Government's witnesses were coached, programmed, and intimidated, the prosecutor's statements vouching for his witnesses and asserting their bravery were fair responses." (emphasis omitted) (quoting United States v. Saenz, 747 F.2d 930, 941 (5th Cir. 1984))).

Moreover, putting aside the fact that the prosecutor's response was tailored to responding to defense counsel's summation, Defendant's right to a fair trial was not substantially affected by the prosecutor's rebuttal. After closing arguments, when charging the jury, the Court explicitly instructed that statements made by the attorneys are not evidence to be considered in deliberation. (See (Tr. 15:11-18 (July 22, 2010 P.M.).) This cured the prejudice Defendant now alleges. See United States v. Retos, 25 F.3d 1220, 1224 (3d Cir. 1994) ("Even if a prosecutor does make an offending statement, the district court can neutralize any prejudicial effect by carefully instructing the jury 'to treat the arguments of counsel as devoid of evidentiary content.'" (quoting United States v. Somers, 496 F.2d 723, 738 (3d Cir. 1974))).

Thus, given that the prosecutor's rebuttal statements were a reasonable invited response and that any prejudice was cured by the Court's subsequent instruction, the prosecutor's statements are not plainly erroneous as to be grounds for

ordering a new trial.[27] See Moore v. Morton, 255 F.3d 95, 113 (3d Cir. 2001) ("When the evidence is strong, and the curative instructions adequate . . . the prosecutor's prejudicial conduct does not deprive a defendant of a fair trial.").

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment of acquittal or, in the alternative, a new trial will be denied.

---

[27] This conclusion is buttressed by the fact that, despite being presented at least three opportunities to object—at side bar, during the rebuttal and at the conclusion of the rebuttal—defense counsel remained conspicuously silent. See United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir. 1995) (holding prosecutor's remarks were not plain error because, amongst other things, "Defense counsel . . . [was] articulate and experienced" but "at the time of the prosecution's remarks, he heard nothing in the Government's response warranting any objection whatsoever").